NO. 07-06-0145-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

OCTOBER 18, 2007
_____

FPL ENERGY UPTON WIND I, L.P., APPELLANT

V.

CITY OF AUSTIN, ACTING BY AND THROUGH ITS
ELECTRIC UTILITY DEPARTMENT, APPELLEE
_____

FROM THE 345TH DISTRICT COURT OF TRAVIS COUNTY;

NO. GN-403274; HONORABLE SCOTT JENKINS, JUDGE
_____

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

**OPINION**

Appellant, FPL Energy Upton Wind I, L.P. (FPL), appeals a judgment rendering declaratory judgment in favor of appellee, the City of Austin, acting by and through its Electric Utility Department (Austin), and ordering that FPL take nothing by its counterclaims.  We affirm.

Background

In 1999, Austin entered into a Wind Power Purchase Agreement with Texas Wind Power Company (Texas Wind). The Agreement was amended twice in 2000 before Texas Wind assigned its interest in the Agreement to FPL in 2001.[1] The Agreement was subsequently amended a third time. However, it is the second amendment in 2000 that is central to the present dispute.

Pursuant to the Agreement, FPL constructed a wind turbine facility in West Texas for the purpose of generating electric energy from wind. The Agreement provides that Austin will pay FPL for energy that it generates and delivers to a "Point of Delivery," identified in the Agreement to be the Austin city limits. However, the Agreement provides FPL the right to make a written election to change the point of delivery from the Austin city limits to the Point of Generation Interconnection (POGI) located on or adjacent to the site of the wind turbine facility. It is undisputed that, at all times pertinent to the present appeal, FPL had made a valid election to move the point of delivery to the FPL POGI. Under the express terms of the Agreement, risk of loss with respect to all energy passes from FPL to Austin "when such energy is made available to Austin . . . at the Point of Delivery." The Agreement also provides that Austin is required to give written notice of dispute of any charge assessed by FPL within 10 days of its receipt of the statement identifying the charge.

---

[1]For purposes of simplicity, we will not distinguish Texas Wind and FPL. All further references to Texas Wind will be by reference to "FPL," as Texas Wind's assignee.

Electric energy is transmitted across Texas over a grid regulated and managed by the Electric Reliability Council of Texas (ERCOT). After electric energy is generated, it is transmitted to a nearby POGI, which is the access point for the energy to get onto the ERCOT grid. Because the POGI is the portal for energy to get onto the ERCOT grid, transmission of energy to a POGI simultaneously places that energy on the ERCOT grid. The energy is then transmitted along the ERCOT grid until it is delivered to a POGI located at the destination point for the electric energy. All of the energy that was covered under the Agreement was to be transported across the ERCOT grid. When the total electric energy being transmitted onto the ERCOT grid reaches high volumes, ERCOT issues instructions that electric energy producers limit their generation of electric energy for periods of time to allow a lessening of congestion on the grid (ERCOT OOME down instructions).[2]

In 2000, the Agreement was amended to provide that, during any period for which FPL makes a valid election to move the point of delivery to the FPL POGI, if Austin does not accept the energy at the point of delivery (defined as a "Curtailment"), Austin is required to pay FPL a curtailment payment for the unaccepted energy. The curtailment payment is set by a formula that presumes that Austin will not accept any of the energy delivered to the point of delivery during the curtailment and imposes a duty on FPL to mitigate damages by requiring it to use commercially reasonable efforts to sell any

---

[2] Electric energy cannot be stored after being generated. When electric energy is generated, it must be immediately transmitted to its destination. Thus, ERCOT OOME down instructions have the effect of limiting energy generation rather than energy transmission.

unaccepted energy to third parties and to apply any payments received toward the curtailment payment owed by Austin.

FPL began producing electric energy in September of 2001. On a few occasions, Austin has elected not to accept energy due to increased costs associated with the transportation of the energy from West Texas to the city of Austin. For each of these voluntary curtailments, FPL invoiced Austin in accordance with the Agreement for the energy it did not accept and Austin paid these invoices.

On other occasions, ERCOT issued ERCOT OOME down instructions directing FPL to limit its generation and delivery of electric energy. On each of these occasions, ERCOT allowed FPL to continue to generate a portion of its electric energy capacity and Austin accepted and paid for the energy delivered to the POGI point of delivery. FPL began sending invoices to Austin that charged Austin the curtailment price for periods covered by these ERCOT OOME down instructions. Within 10 days of Austin's receipt of the first invoice assessing curtailment charges for periods of decreased production due to ERCOT OOME down instructions, Austin sent written notification of dispute of the charges. FPL received this notice of dispute and responded. After receiving additional invoices for curtailment payments arising during periods covered by ERCOT OOME down instructions, Austin sent additional written notification to FPL of its dispute. However, many of these subsequent notifications were not sent within 10 days of Austin's receipt of the invoices including the ERCOT OOME down instruction-related curtailment charges.

After discussions regarding these ERCOT OOME down instruction-related curtailment charges failed to yield results, FPL filed suit for breach of contract in federal court. However, the federal court dismissed the case due to a forum selection clause in the Agreement that required that suit be brought in Travis County, Texas.

Following the dismissal of the federal suit, Austin filed suit in Travis County seeking a declaration whether the Agreement's curtailment provision applies when an ERCOT OOME down instruction prevents FPL from generating energy. Austin additionally sought attorney's fees in relation to its declaratory judgment action. FPL filed an answer, which included a counterclaim for damages for breach of contract.

Before the present case was called for trial, FPL filed a Motion to Open and Close at Trial asserting that FPL had the burden of proof on the whole case. The trial court held a hearing on the motion and Austin assured the trial court that it would submit a formation question as the first question in its proposed jury charge and that Austin would have the burden of proof on this formation question, which was dispositive of its declaratory judgment action. Presumably, on the basis of this assurance by Austin, the trial court overruled FPL's motion.

The case proceeded to trial. At the close of evidence, Austin submitted a proposed jury charge in which the first question was "Does the curtailment provision of amended Section 6.7(b) of the Agreement apply to an ERCOT OOME Down Instruction?" Further, as Austin had indicated at the open/close hearing, this question placed the burden of proof on Austin. FPL submitted a proposed jury charge with the first question asking "Did Austin

Energy fail to comply with the Agreement by failing to pay when due any amount payable under amended Section 6.7 of that Agreement attributable to ERCOT OOME Down Instructions?" Austin objected to FPL's proposed jury charge question one as being improper because ERCOT OOME down instructions do not give rise to curtailment payments under the Agreement as a matter of law and because question number one conflates the concepts of breach and damages. The trial court overruled Austin's objections and submitted FPL's proposed question number one. However, prior to the trial court's ruling on Austin's objections to jury charge question number one, FPL stipulated that, if the jury answered jury charge question number one "No,"

> 1. The Court should consider that the jury has thereby determined that amended Section 6.7 of the Agreement does not apply to ERCOT OOME Down Instructions sufficient to support a declaratory judgment interpreting the Agreement as such . . . .

The case was submitted to the jury and the jury returned a verdict that answered jury charge question number one "No." FPL filed a motion for judgment notwithstanding the verdict and Austin filed a motion for entry of judgment. The trial court heard the parties' arguments regarding these motions, granted Austin's motion for entry of judgment, denied FPL's JNOV motion, and entered judgment declaring that "Austin Energy is not obligated to make curtailment payments pursuant to Section 6.7 of the Wind Power Purchase Agreement, as amended, when ERCOT issues an order to reduce or limit the amount of electricity that can be generated by FPL Energy." The judgment further ordered that FPL take nothing on its counterclaims and awarded Austin $700,000 in attorney's fees through

6

trial, contingent appellate attorney's fees, plus costs of court. It is from this judgment that FPL now appeals.

FPL presents four issues on appeal. By its first issue, FPL contends that the trial court erred in denying FPL's motion to open and close at trial. By its second issue, FPL contends that the trial court erred by upholding Austin's claim of privilege relating to certain evidence. By its third issue, FPL contends that the Agreement's section 6.7 unambiguously requires Austin to pay for energy not accepted at the point of delivery. Finally, by its fourth issue, FPL contends that judgment should have been rendered for FPL on invoices that Austin did not timely pay or dispute in accordance with the contract. Both parties agree that the central issue in this case is whether Austin is contractually obligated to pay for wind energy, under section 6.7 of the Agreement, that is not generated and not accepted due to ERCOT OOME down instructions. Because this is the central issue in this appeal, we will address this issue first.

Section 6.7 of the Agreement

FPL contends that the trial court reversibly erred in not rendering judgment that amended section 6.7 of the Agreement unambiguously and unqualifiedly requires Austin to pay for energy that it does not accept at the contractual point of delivery (defined by amended section 6.7 as a "Curtailment"), even when the curtailment is ERCOT-initiated. In its response, Austin agrees that the Agreement is unambiguous and that it requires Austin to pay for energy not accepted at the contractual point of delivery, but contends that a curtailment does not occur until energy is delivered to the point of delivery and not

7

accepted by Austin. Based on their contentions on appeal, the parties are not in actual dispute as to the proper construction of amended section 6.7, but rather their dispute centers upon amended section 6.7's application to ERCOT OOME down instructions.

The interpretation of an unambiguous contract is a question of law to be determined by the court. Gulf Ins. Co. v. Burns Motors, Inc., 22 S.W.3d 417, 423 (Tex. 2000). When a contract is worded in a manner that allows it to be given a certain or definite legal meaning, it is not ambiguous and the court will construe it as a matter of law. Id. A contract is ambiguous if, after applying the pertinent rules of construction, it is subject to two or more reasonable interpretations. Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 589 (Tex. 1996). In determining whether a contract is ambiguous, the court should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). A proposed contractual interpretation that would render a portion of the contract meaningless is considered an unreasonable interpretation. Am. Mfrs. Mut. Ins. Co. v. Schaefer, 124 S.W.3d 154, 159-60 (Tex. 2003).

Looking solely to the words used in amended section 6.7 of the Agreement, when FPL has made a valid election to move the point of delivery to the FPL-side POGI,[3] "[i]f . . . Austin Energy does not accept the Energy at the Point of Generation Interconnection (such event a "Curtailment"), Austin Energy shall pay" FPL in accordance with the Curtailment

---

[3] That FPL had made such an election applicable at all times pertinent to this case and that this election was valid under the Agreement is not in dispute.

Rate identified in the Agreement (emphasis added). Giving the words used their plain meaning, Austin's duty to either accept the energy or incur the obligation to pay the Curtailment Rate for energy not accepted arises when the energy reaches the POGI point of delivery. Thus, under amended section 6.7, for FPL to be entitled to payment for energy, whether accepted or not accepted by Austin, the Agreement unambiguously requires FPL to deliver the energy to the POGI point of delivery.

That FPL must deliver energy to the point of delivery as a condition precedent to becoming entitled to payment for the energy is bolstered by a review of other provisions contained in the Agreement. Section 3.1 of the Agreement states that Austin "shall pay [FPL] the Primary Price for the Net Electrical Generation of all Energy delivered to Austin Energy at the Point of Delivery . . ." (emphasis added). Thus, under section 3.1 and consistent with amended section 6.7, Austin's payment obligation is triggered when energy is delivered to the point of delivery. Further, section 4.5 of the Agreement states, "Title to and risk of loss with respect to all Energy shall pass to and vest in Austin Energy from [FPL] when such Energy is made available to Austin Energy at the Point of Delivery" (emphasis added). Considering the Agreement as a whole, we conclude that the parties clearly and unambiguously expressed their intent that any loss occurring prior to FPL's delivery of energy to the contractual point of delivery would be borne by FPL, while any loss occurring after energy is delivered to the contractual point of delivery would be borne by Austin. Further, it is FPL's delivery of energy to the POGI point of delivery that gives rise to Austin's obligation to pay for the energy in accordance with the terms of the Agreement.

The parties to the present appeal, however, do not dispute the proper construction of amended section 6.7. By their argument, the parties' dispute is predicated on the factual determination of whether an ERCOT OOME down instruction that limits FPL's ability to generate electrical energy is a non-acceptance by Austin that would constitute a curtailment under the Agreement. The following facts are not in dispute. Electric energy cannot be stored like other fuels. When electric energy is generated, it must immediately be transported through the ERCOT grid to where it will be used. Thus, ERCOT OOME down instructions, which are issued due to high volume congestion on the ERCOT grid, order electrical energy producers to limit their generation of electrical energy to alleviate the congestion. Because ERCOT OOME down instructions prevent electrical energy producers from generating electric energy, they have the secondary effect of precluding delivery of that electrical energy that is not produced. Therefore, as applicable to the present case, while under an ERCOT OOME down instruction limiting FPL's generation of energy, FPL is incapable of generating electrical energy prohibited by the ERCOT OOME down instruction or delivering this energy to the POGI point of delivery. Because FPL is incapable of delivering electrical energy that it is prohibited from generating to the POGI point of delivery while under ERCOT OOME down instructions, Austin's duty to pay under the Agreement is never triggered. Because the effect of an ERCOT OOME down instruction is to prohibit FPL from delivering energy subject to the instruction to the POGI point of delivery, amended section 6.7 does not and could not apply to ERCOT OOME down instructions.

While we agree with FPL's contention that amended section 6.7 unambiguously requires Austin to pay for energy not accepted at the contractually agreed POGI point of delivery, we conclude that FPL goes too far when it additionally contends that amended section 6.7 requires Austin to pay "even when ERCOT initiates the curtailment." According to amended section 6.7(b) of the Agreement, a "Curtailment" is defined as any instance when Austin "does not accept the Energy at the Point of Generation Interconnection." Since a curtailment cannot occur under the Agreement until energy is delivered by FPL to the POGI point of delivery and since delivery of energy to the POGI is not possible under an ERCOT OOME down instruction, it is not possible for ERCOT to initiate a curtailment as defined by the Agreement.

As the proper construction of amended section 6.7 of the Agreement requires FPL to delivery energy to the POGI point of delivery and as delivery of energy that is capable of being produced but prohibited by an ERCOT OOME down instruction is not possible, we affirm the trial court's declaration that Austin is not obligated to make curtailment payments pursuant to amended section 6.7 of the Agreement when ERCOT issues an order or instruction to reduce or limit the amount of electric energy that can be generated by FPL.

Open and Close Rights & Evidentiary Rulings

FPL contends that the trial court reversibly erred in denying FPL's Motion to Open and Close at Trial because FPL had the burden of proof on the whole case. FPL also contends that the trial court reversibly erred in sustaining Austin's assertion of privilege as to certain documents relating to negotiations of amended section 6.7. Austin's claim for

11

declaratory relief was premised on interpretation of the Agreement and its application to the facts in this case. FPL's counterclaims, except its claim of waiver, were premised on the contention that Austin breached the Agreement by failing to make curtailment payments for energy not accepted due to ERCOT OOME down instructions. Thus, excepting FPL's claim of waiver, a declaration that amended section 6.7 does not obligate Austin to make curtailment payments for energy which FPL could not generate or deliver due to ERCOT OOME down instructions resolves all claims in the case, including FPL's counterclaims alleging breach of the Agreement for Austin's failure to make curtailment payments. The evidence that the trial court ruled to be privileged was clearly extraneous to the Agreement and extraneous evidence may not be considered by a court to alter the import of the plain meaning of the words used in an unambiguous contract.[4] See Universal C.I.T. Credit Corp. v. Daniel, 150 Tex. 513, 243 S.W.2d 154, 157 (1951). Standard Accident Ins. Co. v. Blythe, 130 Tex. 201, 107 S.W.2d 880, 883 (1937). Since all claims involved in this case, except FPL's claim of waiver and Austin's claim for attorney's fees, were resolved by the interpretation of the unambiguous amended section 6.7 and the undisputed effect of an ERCOT OOME down instruction on FPL's ability to deliver energy to the POGI point of delivery, any error in the trial court's denial of FPL's Motion to Open and Close at Trial or the denial of evidence is harmless because it did not probably cause the rendition of an improper judgment nor did it probably prevent FPL from properly

---

[4] Even if this evidence conclusively established that the parties to the Agreement intended that amended section 6.7 would obligate Austin to pay for energy that was not generated or delivered to the point of delivery due to an ERCOT OOME down instruction, the plain meaning of the words used in amended section 6.7 do not express this intent and this extraneous evidence of intent could not be utilized to make the otherwise unambiguous contract ambiguous.

12

presenting the case to this Court.  See TEX. R. APP. P. 44.1(a); Seureau v. Mudd, 515

S.W.2d 746, 750 (Tex.App.–Houston [14ᵗʰ Dist.] 1974, writ ref'd n.r.e.).

Waiver

Finally, FPL contends that judgment should have been rendered for FPL on invoices

that Austin did not timely dispute in accordance with the Agreement.  Specifically, FPL

relies on section 8.1 of the Agreement, which states, in relevant part, that

> On or before the tenth day of each month during the term of this Agreement, [FPL] shall render a statement for the Energy delivered to Austin Energy during the preceding month and for other compensation owed to [FPL] hereunder. . . .  If Austin Energy disputes any charges included in [FPL]'s statement, Austin Energy shall give written notice of the same describing the basis thereof within ten (10) days of receipt of the statement.

A jury question was submitted on this issue and the jury found that Austin did not waive the

right to dispute the amounts of the payments invoiced by FPL for ERCOT OOME down

instructions.  FPL's appellate issue contends that the undisputed evidence conclusively

establishes that Austin failed to provide written notice of dispute in a timely manner under

the Agreement for certain invoices.

As previously stated, the interpretation of an unambiguous contract is a question of

law to be determined by the court.  Gulf Ins. Co., 22 S.W.3d at 423.  When a contract is

worded in a manner that allows it to be given a certain or definite legal meaning, it is not

ambiguous and the court will construe it as a matter of law.  Id.  A contract is ambiguous

if, after applying the pertinent rules of construction, it is subject to two or more reasonable

interpretations.  Columbia Gas Transmission Corp., 940 S.W.2d at 589.  In determining

13

whether a contract is ambiguous, the court should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. Coker, 650 S.W.2d at 393 (Tex. 1983). A proposed contractual interpretation that would render a portion of the contract meaningless is considered an unreasonable interpretation. Am. Mfrs. Mut. Ins. Co., 124 S.W.3d at 159-60.

Section 8.1 of the Agreement provides that FPL "shall render a statement for the Energy delivered to Austin Energy during the preceding month and for other compensation owed to [FPL] hereunder. . ." (emphasis added). As addressed in the analysis of FPL's first issue, FPL did not and could not deliver energy to the point of delivery while under ERCOT OOME down instructions. Therefore, for section 8.1's written dispute requirement to apply to invoiced curtailment charges based on ERCOT OOME down instructions, such charges had to be "compensation owed to [FPL]" under the Agreement. Section 3 of the Agreement identifies the forms of "compensation" that Austin could owe FPL under the Agreement. According to this section, Austin owes compensation to FPL for energy delivered to the point of delivery, section 3.1, for costs of delivery to the point of delivery, section 3.2, and for the loss of the benefit of certain unrenewed tax credits, section 3.3.[5] As a result, FPL's invoices charged Austin curtailment payments for energy not generated and not delivered due to ERCOT OOME down instructions and these charges were not

---

[5] Sections 3.4 and 3.5 provide for certain potential benefits to FPL, but neither would give rise to Austin owing compensation to FPL.

14

and could not be "other compensation owed to [FPL] hereunder [or under the Agreement] . . . ."

Therefore, FPL's act of invoicing Austin for compensation which, under the Agreement, was not owed to FPL constituted a breach of the Agreement. A breach of a contract by one party excuses the performance of the other. See Barnett v. Coppell N. Tex. Court, Ltd., 123 S.W.3d 804, 815 (Tex.App.–Dallas 2003, pet. denied) (citing Mead v. Johnson Group, Inc., 615 S.W.2d 685, 689 (Tex. 1981)). Thus, we conclude that Austin was under no obligation to give FPL written notice of dispute regarding invoices charging Austin for energy which was neither generated nor delivered due to ERCOT OOME down instructions and its failure to provide such written notice did not constitute a breach of the Agreement. We overrule FPL's fourth issue.

Conclusion

We affirm the judgment of the trial court.


Mackey K. Hancock
Justice


15