COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-06-124-CV

 

 

ALICE LONGFELLOW, INDEPENDENT                                      APPELLANT



EXECUTRIX
OF THE ESTATE OF 

CHARLEY
G. MARTIN

 

                                                   V.

 

RACETRAC PETROLEUM, INC. AND                                        APPELLEES

WAL-MART
STORES EAST, INC.

 

                                              ------------

 

               FROM
PROBATE COURT NO. 1 OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------








Alice Longfellow, independent
executrix of the estate of Charley G. Martin, appeals from the trial court=s amended judgment in favor of RaceTrac Petroleum, Inc., granting
RaceTrac specific performance of the parties= contract and attorney=s fees.[2]  We affirm.

I.  Background

In May 1998, Martin and
RaceTrac signed a AReal Estate
Purchase Contract@
(hereinafter sometimes referred to as the RaceTrac contract), providing for the
sale of approximately sixteen acres of Martin=s land in Grand Prairie for $1 million.  Longfellow initially acted as Martin=s agent under a power of attorney and, later, as executrix of his
estate.  Following execution of the
contract, RaceTrac paid $10,000.00 earnest money as required under the
contract.  RaceTrac also expended over
$36,000.00 on engineering and environmental work on the property, retained a
title company, and obtained a survey. 








Under the contract, RaceTrac
had a ninety-day Apermit
period@ after receipt of the survey to obtain Aall governmental permits, licenses, variances, and approvals@ necessary for it to operate a store on the contract property.  If RaceTrac was unable to obtain the required
permits within ninety days, the contract allowed it, Aby giving notice to Seller, [to] extend the Permit Period for an
additional sixty (60) days.@  In the event RaceTrac extended
the permit period and was able to obtain the permits, the contract provided
that A[c]losing shall be held within ten (10) days following the end of the
Permit Period.@   

The contract also contained a
gas restriction that provided as follows: 

Seller
will execute . . . at or prior to Closing, a restriction in recordable form
which will run with the land prohibiting . . . a retail outlet for motor fuels
or a convenience store . . . on any land now owned or controlled by Seller or
Seller=s
affiliates within one mile of any boundary of the Contract Property.  Should Seller or any of Seller=s
affiliates sell or lease prior to Closing, all or any part of such restricted
property, such sale or lease shall be subject to Purchaser=s
rights under this Contract and Seller shall ensure that any lease or instrument
of conveyance of such property shall specifically so state. 

 

RaceTrac=s general counsel, Claude Czaja, testified that the gas restriction
was very important to RaceTrac and is common in the industry.  Longfellow admitted that she did not read the
contract but signed it on the advice of her attorneys, and she claimed that she
was initially unaware of the gas restriction.[3]









RaceTrac received a survey of
the contract property on September 1, 1998, and notified Martin and Longfellow
in writing that the permit period would run through November 30, 1998.  RaceTrac then began the process of applying
for a property plat from the City of Grand Prairie.  On November 20, 1998, RaceTrac notified
Longfellow in writing that it was exercising its right to extend the permit
period for an additional sixty days, from November 30, 1998, through January
29, 1999, and Longfellow did not object. 
Pursuant to the contract, therefore, Aso long as RaceTrac was able to obtain the required permits,@ closing was to be within ten days after the permit period expired, or
by February 8, 1999. 








Czaja testified that RaceTrac
learned of Martin=s November
20, 1998 death the week before closing was to occur.  In preparation for closing, RaceTrac
requested an updated title commitment and asked the title company whether Longfellow
could sign the closing documents in light of Martin=s death.  On February 3, 1999,
the title company indicated that taxes might be due because of the size of
Martin=s estate, and RaceTrac could either close the deal and have the
proceeds held in escrow until the title company received the Estate=s inventory and appraisement or, if the title company received the
documents, it could pay the taxes.  There
was also a mechanic=s lien on
the property, and the Estate would have to resolve both problems at closing.[4]  The following day, February 4, 1999, RaceTrac
notified Longfellow and her attorneys of the two Amatters affecting title@ that the Estate needed to address.[5]


On February 5, 1999,
Longfellow=s
then-attorney Gilbert Smith told Czaja Ain no uncertain terms@ that the Estate was not going to come to the closing table.  Specifically, Smith said that the Estate did
not have the inventory and appraisement in order, that those documents could
take a year to complete, and that the Estate did not have $140,000.00 to pay
off the mechanic=s lien.[6]  RaceTrac immediately notified the Estate in
writing that it would extend the time for closing, pursuant to the contract, to
allow time to remove the title objections.[7]  RaceTrac=s letter further stated, APurchaser stands ready to close the transaction upon Seller=s satisfaction of the above-referenced title matters.@  Czaja conceded, however, that
RaceTrac never tendered the $1 million 
purchase price. 








Thereafter, in March 1999,
the Estate settled a separate lawsuit with GSW & 20 Partners, Ltd., with
whom Martin had contracted to sell 107 acres of land, including the sixteen
acres that are the subject of the RaceTrac contract.[8]  Pursuant to the GSW settlement agreement,
Blackhawk Partners I, Ltd., would buy 75 acres of property from the Estate.[9]  Blackhawk, in turn, agreed to sell part of
the property it was purchasing to Wal-Mart Stores East, Inc., with closing to
be held in May 1999.  The land Wal-Mart
planned to purchase was located within approximately one-half mile of the land
under contract with RaceTrac. 

The first time Blackhawk
learned of RaceTrac=s gas
restriction was immediately prior to its closing with Wal-Mart.  Although Wal-Mart was willing to purchase
part of the property with the gas restriction in place, the covenant made the
property less valuable to Wal-Mart. 
Accordingly, the parties agreed that $450,000.00 of Wal-Mart=s purchase price would be placed into an escrow account pending
resolution of the RaceTrac-Estate litigation. 








Meanwhile, continuing to
believe that the Estate was unable to close because it lacked sufficient funds
to pay the mechanic=s lien,
Czaja contacted a second title insurance company in an effort to facilitate
closing.  On May 20, 1999, RaceTrac
informed the Estate that the second title company offered to write a title
policy that would require it to place only the net proceeds into
escrow.  RaceTrac also offered to waive a
provision in the contract that required the Estate to give RaceTrac a legal
description of its other property within one mile of the contract
property.  The Estate rejected RaceTrac=s offer on June 7, 1999. 

Thomas Metcalfe, a real
estate broker, testified that Longfellow told him in August 1999 that she was
aware of the gas restriction in the RaceTrac contract, knew that Wal-Mart
wanted to sell gas on the property it was buying, and that if it became an
issue she would simply not close on the contract with RaceTrac.  Longfellow denied speaking with Metcalfe and
impugned his Abusiness
ethics.@     








On September 27, 1999,
Longfellow and her then-attorney Michael McCue flew to Atlanta for a meeting at
RaceTrac=s corporate office.  Czaja
testified that Longfellow demanded that RaceTrac remove the gas restriction,
but RaceTrac refused to renegotiate the contract.  Longfellow claimed that she went to the
meeting to close on the contract, but RaceTrac refused.  The meeting lasted approximately ten minutes,
and at the conclusion of the meeting, McCue handed Czaja a typed letter
purporting to terminate the contract, claiming it was unenforceable.  

Brad Bowen, who was
associated with both GSW and Blackhawk, testified that Longfellow Asequestered@ Martin,
preventing him from outside contact. 
Further, Bowen did not trust Longfellow because she was Aevasive@ when asked
for proof of her power of attorney. 
Bowen described Longfellow as having Airrational@ responses
and being Aa loose
cannon,@ Avery
unreasonable,@ Avolatile,@ Adifficult to work with@, and Aimpossible
to deal with.@  During her own testimony, Longfellow claimed
that she was the victim of a Aconspiracy to do land fraud@ perpetrated by Martin=s longtime accountant, his longtime attorney, Bowen, RaceTrac, and
several of Longfellow=s previous
attorneys, and she contended that she had been physically threatened. 

In 2001, RaceTrac sued the
Estate, alleging breach of the contract and seeking specific performance,
damages, and attorney=s fees.  The Estate counterclaimed, seeking a
declaratory judgment that the contract was unenforceable and asserting slander
of title, tortious interference with contract, and an action to quiet title. 








In 2004, the Estate joined
Wal-Mart as a party to the litigation. 
Shortly before trial, Wal-Mart entered into separate Rule 11 agreements
with both the Estate and RaceTrac providing that Wal-Mart would not attend the
trial and that Wal-Mart and the other party to the agreement would not pursue
any claims against the other.  Further,
Wal-Mart and the Estate agreed that if RaceTrac obtained judgment for specific
performance and the gas restriction remained in place, then Wal-Mart would be
entitled to the $450,000.00 escrowed funds. 
Alternatively, if RaceTrac did not obtain judgment for specific
performance and the gas restriction was lifted, the escrowed funds would be
paid to the Estate.

Following a three-day trial,
the jury answered four special issues favorably to RaceTrac.[10]  Thereafter, the trial court rendered an
amended final judgment granting RaceTrac specific performance and attorney=s fees.  The judgment
additionally provided that the funds in escrow be released to Wal-Mart. 

II.  The Estate=s Issues

The Estate raises twenty
issues.  Issues one through ten require
us to construe the contract and review the sufficiency of the evidence to
support certain jury findings.  Issues
eleven through sixteen complain of the jury charge.  The remaining four issues challenge the award
of attorney=s fees to
RaceTrac and seek recovery of attorney=s fees and earnest money from RaceTrac and Wal-Mart.

III.  Construction of the RaceTrac Contract








We will begin our analysis
with the following issues requiring us to construe the RaceTrac contract:

$      
RaceTrac is not entitled to specific performance
because the option contract lacks mutuality of remedy;  

 

$                                                      
The RaceTrac contract is unenforceable because it
lacks mutuality of obligation; 

 

$      
The RaceTrac contract is unenforceable because it
violates the rule against perpetuities;

 

$      
The option was revocable by the Estate at any
time before RaceTrac exercised the option because RaceTrac never paid
independent consideration for the option; and

 

$      
RaceTrac=s demand that the Estate
produce its inventory and appraisement or escrow the sales proceeds was not
permitted by the contract.

 

A.  Rules
of Contract Construction








The interpretation of an unambiguous contract is a question of law to
be determined by the court.[11]  When a contract is worded in a manner that
allows it to be given a certain or definite legal meaning, it is not ambiguous
and the court will construe it as a matter of law.[12]  A contract is ambiguous if, after applying
the pertinent rules of construction, it is subject to two or more reasonable
interpretations.[13]  In determining whether a contract is
ambiguous, the court should examine and consider the entire writing in an
effort to harmonize and give effect to all the provisions of the contract so
that none will be rendered meaningless.[14]









An
unambiguous contract must be enforced as written, examining the entire document
and giving terms their plain, ordinary, and generally accepted meaning unless
the instrument shows that the parties used them in a technical or different
sense.[15]  Language is given its regular grammatical
meaning unless to do so would defeat the parties= objective intent as expressed in the written contract.[16]  When we have the choice of construing a
contract as valid or as void, we construe it in such a way as to make it valid.[17]  We may imply terms or covenants in a contract
Asparingly,@ only where
they were Aclearly
contemplated@ or Anecessary to effectuate [the] parties= intentions and purposes in contracting.@[18]

B.  Consideration

The Estate
argues that the RaceTrac option contract is unenforceable and revocable at will
because it lacked consideration. 








As a general
rule, a contract must be based on valid consideration, or mutuality of
obligation.[19]  Consideration is defined as either a benefit
to the promisor or a loss or detriment to the promisee.[20]  A contract that lacks consideration lacks
mutuality of obligation and is unenforceable.[21]  There is a presumption that a written
contract is supported by consideration, and we construe a contract in favor of
mutuality of obligation.[22]









An option
contract[23]
has two components: (1) the underlying contract which is not binding until
accepted; and (2) the covenant to hold open to the optionee the opportunity to
accept.[24]  The option agreement component states the
terms upon which the seller is willing to sell his land, if the optionee elects
to accept within the agreed time.[25]  Both the option and the underlying contract
must be supported by consideration.[26]  If no consideration is paid, the option is
revocable during its term until exercised.[27]  Once consideration passes, the option becomes
irrevocable.[28]

Option
contracts are different from other contracts in that an option contract lacks
mutuality of obligation at its inception.[29]  In a contract where the buyer=s liability is limited to the forfeiture of earnest money, mutuality
of obligation is created when independent consideration is paid or when the
optionee exercises performance.[30]









RaceTrac
exercised performance in February 1999 by notifying the Estate that it intended
to close on February 8, 1999, the date contemplated by the contract, and by
making appropriate preparations for closing. 
After the Estate refused to close, RaceTrac extended the time for
closing, as it was permitted to do under the contract, to allow the Estate more
time to cure the title problems.  Once
RaceTrac exercised its option through these actions, mutuality of obligation
was created.[31]  For these reasons, we hold that the RaceTrac
contract was supported by consideration. 

C.  Specific Performance and Mutuality of Remedy

The Estate
next argues that RaceTrac was not entitled to specific performance because the
contract lacked mutuality of remedy.  The
Estate contends that the contract did not permit the Estate to seek specific
performance, and, therefore, RaceTrac cannot be entitled to specific
performance either. 

The RaceTrac
contract provides, A[The Estate]
and [RaceTrac] acknowledge that it is impossible to measure the damages which
would accrue to RaceTrac by reason of [the Estate=s] default hereunder. 
Accordingly, [RaceTrac] may enforce this contract and [the Estate=s] obligations hereunder in an action seeking specific performance.@ 








The general
rule in Texas is that if one party breaches a contract for the sale of real
estate, the other party can enforce the contract through specific performance.[32]  Specific performance will be granted only in
cases where there is a mutuality of remedy.[33]  The absence of mutuality of remedy when a
contract is executed, however, does not make the contract unenforceable so long
as mutuality of remedy is subsequently supplied.[34]  Mutuality of remedy may be subsequently
supplied by performance of the party who seeks specific performance.[35]  

When
RaceTrac performed under the contract and stood ready, willing, and able to
close, mutuality of remedy was supplied, and the Estate could have enforced the
contract against RaceTrac.[36]  We, therefore, hold that specific performance
was a proper remedy in this case.








D.  Rule
Against Perpetuities

The Estate argues that the option contract is
unenforceable because it violated the rule against perpetuities.  The Estate has waived this complaint,
however, because it was not raised in the trial court.[37]


The Estate, nevertheless, contends that Czaja=s testimony established that the contract was illegal and, therefore,
the rule against perpetuities issue was tried by consent.  We disagree. 
On cross-examination, Czaja disputed the Estate=s attorney=s suggestion
that the contract could Astay alive
forever@; he contended that if a party did nothing it would eventually be in
default; and he noted that the contract specifically provided that Atime is of the essence.@  This testimony alone was
insufficient to bring the rule against perpetuities before the trial court by
the active assistance of both parties.[38]

The Estate
further contends that the contract is illegal on its face because a contractual
provision allowed RaceTrac to extend indefinitely the time for closing.  The provision in question provides as
follows:








If [RaceTrac] has objections to the title or survey of the Contract
Property, a written statement of such objections shall be furnished to [the
Estate], in which event [the Estate] shall have fifteen (15) days after receipt
of said statement to satisfy all objections and, if [the Estate] fails to
satisfy such objections within that time then: [RaceTrac] may . . . extend the
time for Closing to allow [the Estate] or [RaceTrac] additional time to
remove such objections . . . .  (emphasis supplied)

 

We construe
a contract in a way that renders it enforceable rather than invalid even where
the rule against perpetuities is involved.[39]  In the absence of a provision of time for
performance, the law implies that a reasonable time was intended.[40]  

We hold that
the term Aadditional
time@ in the RaceTrac contract was intended by the parties to provide a
reasonable time for performance. 
Therefore, the contract was not illegal on its face.

E.  Inventory
and Appraisement








The Estate next contends that RaceTrac=s requirements that the Estate provide an inventory and appraisement
or escrow the sales proceeds were not permitted by the contract.  Additionally, it argues that the contract
only permitted RaceTrac to provide additional title or survey objections based
on updated title commitments or surveys, and RaceTrac failed to prove that the
additional requirements resulted from an updated title commitment or survey. 

The RaceTrac
contract states,

At closing . . . [the Estate] shall execute and deliver to [RaceTrac]
a General Warranty Deed, satisfactory in form and substance to [RaceTrac],
conveying good and marketable fee simple title to the Contract Property, free
and clear of all liens, encumbrances, easements and restrictions of every
nature and description. . . . [The Estate] shall execute and deliver with the
deed such other instruments as may be required by the title insurance company to
issue its policy of title insurance and any and all other documents deemed
reasonably necessary by [RaceTrac] to consummate the transactions contemplated
herein. 

 

The plain
language of the contract required the Estate to provide at closing Agood and marketable title@ and to deliver any instruments required by the title insurance
company in order to issue a title insurance policy.  Therefore, the requirements that the Estate provide
an inventory and appraisement as required by the title insurance company were
authorized by the contract.  The evidence
is undisputed that the title insurance company required the Estate=s inventory and appraisement, or to hold the proceeds in escrow, in
order to issue a title insurance policy. 
Thus, we hold that the RaceTrac contract allowed RaceTrac to demand that
the Estate produce these documents, or allow the proceeds to be escrowed in
order to close.








IV.  Issues
Challenging the Evidence Supporting the Jury Findings

The jury answered the following four questions:

SPECIAL QUESTION # 1:

On or after February 8, 1999, did Longfellow fail to comply with the
Contract with Racetrac?

 

Answer AYes@ or ANo@   Yes

If you
answered Special Question #1 AYes@ then answer
Special Question #2, otherwise do not answer Special Question #2.

SPECIAL
QUESTION # 2:

Was Longfellow=s failure to
comply excused?

Answer AYes@ or ANo@  No

SPECIAL
QUESTION # 3:

Was Racetrac ready, willing
and able to perform its obligations under the Contract on: (Answer AYes@ or ANo@ for
both):

 

A.  February 8, 1999                   Yes

B.  February 9, 1999 through 

     September 27, 1999               Yes

SPECIAL
QUESTION # 4:

Did Racetrac fail to comply with the Contract?

Answer AYes@ or ANo@  No   

 








A.  RaceTrac=s Performance

The Estate
argues that the jury=s answers to
the first three questions should be disregarded because RaceTrac failed to
tender performance or payment.  According
to the Estate, the contract expired because RaceTrac failed to timely exercise
its contractual rights.  Alternatively,
the Estate argues that the contract was revoked and terminated before RaceTrac
purportedly exercised its option rights.  









We may
sustain a challenge to a jury finding based on legal sufficiency[41]
only when (1) the record discloses a complete absence of evidence of a vital
fact; (2) the court is barred by rules of law or of evidence from giving weight
to the only evidence offered to prove a vital fact; (3) the evidence offered to
prove a vital fact is no more than a mere scintilla; or (4) the evidence
establishes conclusively the opposite of a vital fact.[42]  In determining whether there is legally
sufficient evidence to support the finding under review, we must consider
evidence favorable to the finding if a reasonable fact-finder could and
disregard evidence contrary to the finding unless a reasonable fact-finder
could not.[43]


An assertion
that the evidence is factually insufficient to support a fact finding means
that the evidence supporting the finding is so weak or the evidence to the
contrary is so overwhelming that the answer should be set aside and a new trial
ordered.[44]  We are required to consider all of the
evidence in the case in making this determination, not just the evidence that
supports the finding.[45]  








The exercise
of an option to purchase must be positive, unconditional, and unequivocal, and
is equivalent to the acceptance of an offer.[46]  When one party refuses to perform its
obligations under a contract, however, the other party need not tender
performance before suing to enforce the contract through specific performance.[47]  One of our sister courts has held, for
example, that where a buyer of land performed all that the contract required of
him except actually tender the purchase price, and was financially able to pay,
but the seller refused to convey the land, the buyer was entitled to specific
performance.[48]


The jury=s findings that Longfellow failed to comply with the contract on or
after February 8, 1999; that Longfellow=s failure to comply was not excused; and that RaceTrac was ready,
willing, and able to perform its obligations under the contract on February 8,
1999 through September 27, 1999, were supported by the following evidence: 








Czaja
testified that RaceTrac made appropriate preparations for closing in the week
prior to February 8, 1999; that RaceTrac notified the Estate of its intention
to close and the title objections revealed by the title company; that the Estate
refused to close; that RaceTrac properly extended the time for closing to allow
the Estate more time to cure the title problems; and that RaceTrac continued to
try to close after February.  The parties= written correspondence in the record fully corroborates Czaja=s testimony.  

Longfellow,
on the other hand, asserted that she wanted to close the contract but RaceTrac
refused, and she claimed that she was the victim of a conspiracy.  The Estate also offered the testimony of
RaceTrac=s vice president of real estate, who indicated that RaceTrac did not
intend to develop or market certain extra acreage included in the deal with the
Estate.  Further, the Estate called Chuck
Hartley, Longfellow=s employee
who also attended the meeting in Atlanta. 
Hartley testified that RaceTrac had seven or eight people at the
meeting, whereas Longfellow=s party was comprised of only three. 
Hartley stated that Longfellow Awanted the deal to go through@ but RaceTrac @kind of
laughed at her.@  The Estate also called Czaja, who maintained
his position that, at the meeting in Atlanta, Longfellow tried to renegotiate
the contract without the gas restriction.








Czaja
conceded that RaceTrac did not tender the purchase price, but maintained it had
the financial ability to do so.  RaceTrac
argued in closing that the resolution of the case turned on whose version of
eventsCLongfellow=s or Czaja=sCthe jury
believed.  The jury, who is the sole
judge of the credibility of witnesses and may choose to believe one witness
over another, evidently believed Czaja.[49]  

Applying the
appropriate legal and factual sufficiency standards of review, we hold that the
evidence was sufficient to support the jury=s findings that Longfellow failed to comply with the contract; that
her failure was not excused; and that RaceTrac was ready, willing, and able to
perform its obligations under the contract.

B.  RaceTrac=s Exercise of the Sixty-Day Extension

The Estate
argues that there was Ano evidence@ to support the jury=s failure to find that RaceTrac did not comply with the RaceTrac
contract.  Specifically, the Estate
contends that because there is no evidence showing that RaceTrac was entitled
to the contractual sixty-day extension to the permit period, the contract expired
on November 30, 1998, as a matter of law.








When a party
attacks the legal sufficiency of an adverse finding on an issue on which it had
the burden of proof, it must demonstrate on appeal that the evidence
establishes, as a matter of law, all vital facts in support of the issue.[50]  In reviewing a Amatter of law@ challenge,
we must first examine the record for evidence that supports the finding, while
ignoring all evidence to the contrary.[51]  If there is no evidence to support the
finding, we then examine the entire record to determine if the contrary
proposition is established as a matter of law.[52]  We may sustain the point only if the contrary
proposition is conclusively established.[53]

There is
evidence in the record showing that RaceTrac complied with the terms of the
contract in seeking the sixty-day extension. 
The contract allowed RaceTrac to extend the permit period upon written
notice to Longfellow if RaceTrac was unable to obtain all required permits
within the original ninety-day permit period, which was to expire on November
30, 1998.  On November 13, 1998, the City
of Grand Prairie notified RaceTrac that the matter would be submitted for a
hearing before the city=s planning
and zoning commission on December 7, 1998, and indicated that a RaceTrac
representative should attend the meeting. 
On November 20, 1998, RaceTrac notified the Estate in writing that it
was exercising the extension.  The Estate
did not object to RaceTrac=s efforts to extend the permit period. 









We hold
that, because there is some evidence that RaceTrac properly exercised its right
to the sixty-day extension under the RaceTrac contract, there is evidence that
supports the jury=s challenged
finding, and RaceTrac=s failure to
comply with the RaceTrac contract was not established as a matter of law.

V.  Challenges to the Jury Charge

A.  Omitted Questions

The Estate
argues that the trial court abused its discretion by failing to submit jury
questions asking whether RaceTrac was entitled to the contractual sixty-day
extension; whether RaceTrac properly and finally accepted the contract and
tendered performance, or finally accepted the option before the Estate
terminated the contract; whether the contract was an option contract; and
whether RaceTrac paid independent consideration for the options. 








A party is
entitled to a jury question or instruction if the pleadings and evidence raise
an issue.[54]  We review a trial court=s decision to submit or refuse a particular question or instruction
for an abuse of discretion, recognizing that whenever possible the trial court
should submit a cause upon broad-form questions.[55]  The trial court does not abuse its discretion
in refusing to submit questions that are adequately encompassed within
broad-form questions it does submit.[56]

The question
of whether RaceTrac complied with the terms of the contract was submitted to
the jury, and the jury failed to find that RaceTrac did not comply with the
contract.  This broad form question
encompasses the issue of whether RaceTrac properly invoked the sixty-day
extension.  We, therefore, hold that the
trial court did not abuse its discretion by failing to submit a question asking
specifically whether RaceTrac was entitled to the contractual sixty-day
extension.[57]








Further, the
jury found that Longfellow failed to comply with the RaceTrac contract, that
her failure to comply was not excused, and that RaceTrac stood ready, wiling,
and able to perform its obligations from February 8, 1999 through September 27,
1999.  The jury also failed to find that
RaceTrac failed to comply with the contract. 
These findings adequately encompass the issues on acceptance and
performance that the Estate argues should have been submitted.  Therefore, the trial court did not abuse its
discretion by failing to submit questions on those issues.[58]









The Estate
further contends that the trial court erred by not submitting questions asking
whether the contract was an option contract and whether the option contract was
supported by consideration.  Those are, however,
questions of law which the trial court was not required to submit to the jury.[59]  Moreover, the fact that the contract is an
option contract was undisputed at trial. 
When issues are undisputed, there is no need to submit them to the jury.[60]  We hold, therefore, that the trial court did
not abuse its discretion in refusing to submit the Estate=s questions about whether the contract was an option contract and
whether the option contract was supported by consideration.

B.  Erroneous Waiver Definition

The Estate
asserts that the trial court=s definition of Awaiver@ as Athe
voluntary relinquishment of a known right@ was incomplete.  According to
the Estate, the definition should have included the second part of Texas
Pattern Jury Charge 101.24 that states waiver is also Aintentional conduct inconsistent with claiming the right.@  

A trial
court is to include in its charge the questions, instructions, and definitions
raised by the pleadings and evidence.[61]  The trial court has considerable discretion
in framing a jury charge and is given wide latitude to determine the propriety
of explanatory instructions and definitions.[62]  








An erroneous
definition requires reversal only if it Aprobably caused the rendition of an improper judgment.@[63]  Assuming without deciding that
the trial court erred by failing to include the second part of the definition
of waiver, we hold that the Estate was not harmed by the alleged erroneous
definition. 

The issue of
waiver was relevant to special question number two; this question asked, if the
jury found that Longfellow failed to comply with the RaceTrac contract, whether
her failure to comply was excused.  The
trial court instructed the jury that A[f]ailure to comply may be excused . . . if
compliance is waived@ and defined
waiver as Athe
voluntary relinquishment of a known right.@ 

The Estate
argued in closing that Longfellow=s failure to comply, if any, was excused because RaceTrac either
repudiated the contract or waived compliance by its own refusal to close on the
deal.  A recurring theme throughout the
Estate=s closing argument was its assertion that RaceTrac improperly Atied up the land@ by filing
memorandums of contract in the Tarrant County deed records while refusing to
close. 

The
submitted definition of waiver includes within its meaning the type of
intentional conduct that the Estate argued RaceTrac committed.  The act of voluntarily relinquishing a known
right necessarily includes intentional conduct inconsistent with claiming the
right.  








For these
reasons, we hold that the partial definition of waiver, if error, did not
probably cause the rendition of an improper judgment, and the error, if any,
was harmless.[64]

VI.  Escrowed Funds and Earnest Money

The Estate
argues that it is entitled to the funds escrowed by Wal-Mart and RaceTrac=s earnest money. 

The Rule 11
agreement between the Estate and Wal-Mart provided that if RaceTrac obtained a
judgment for specific performance and the gas restriction remained in place,
Wal-Mart would be entitled to the $450,000.00 escrowed funds.  Because we are affirming the trial court=s judgment granting this relief, the Estate is not entitled to the
escrowed funds pursuant to its agreement with Wal-Mart.

Similarly,
the RaceTrac contract states that the Estate would receive RaceTrac=s earnest money if the sale of the property was not consummated in
accordance with the contract due to RaceTrac=s default.  The jury, however,
found that Longfellow breached the contract, not RaceTrac, and we have
concluded that the evidence is sufficient to support the jury=s findings.  Thus, the Estate is
not entitled to RaceTrac=s earnest
money.  








VII. 
Conclusion

Accordingly, we overrule all of the Estate=s issues and affirm the trial court=s judgment.[65]

PER CURIAM 

PANEL A:  CAYCE, C.J.; LIVINGSTON and GARDNER, JJ.

DELIVERED:  June 12, 2008  
                       











[1]See Tex. R. App. P. 47.4.





[2]We
refer to appellant as Athe
Estate,@
except where a distinction between AMartin@ and ALongfellow@ is
appropriate.





[3]Martin
also signed the contract.  





[4]If
there had been no estate tax issue, the title company would have withheld funds
from the purchase price to pay the mechanic=s lien.  But, with the estate tax problem, the title
company required the entire $1 million purchase price to be escrowed and the
Estate to Abring
that $140,000 to the closing@ to cover the mechanic=s
lien.  





[5]The
contract required the Estate to deliver Agood and marketable fee
simple title . . . free and clear of all liens [and] encumbrances@ at
closing. 





[6]Longfellow
later testified, however, that the Estate had $100,000.00 or more at the time
of Martin=s death.






[7]Under
the terms of the contract, the Estate had fifteen days from receipt of RaceTrac=s
written notice to cure the title objections. 
If the Estate failed to satisfy the title objections within that time,
one remedy available to RaceTrac was to extend the time for closing.  





[8]GSW
sued Martin for breach of contract in 1997. 





[9]Some
of the same individuals who formed GSW also ran Blackhawk. 





[10]The
jury also answered two additional questions pertaining to attorney=s
fees. 





[11]Gulf
Ins. Co. v. Burns Motors, Inc., 22 S.W.3d 417, 423 (Tex.
2000); FPL Energy Upton Wind I, L.P. v. City of Austin ex rel. Elec.
Util. Dep=t, 240
S.W.3d 456, 463 (Tex. App.CAmarillo 2007, no pet.).





[12]Gulf
Ins. Co., 22 S.W.3d at 423; FPL Energy, 240 S.W.3d
at 463.





[13]Columbia
Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 589
(Tex. 1996); FPL Energy, 240 S.W.3d at 463.





[14]MCI
Telecomms. Corp. v. Tex. Utils. Elec. Co., 995 S.W.2d 647, 652
(Tex. 1999).





[15]Heritage
Res., Inc. v. NationsBank, 939 S.W.2d 118, 121 (Tex. 1996).





[16]DeWitt
County Elec. Co-op., Inc. v. Parks, 1 S.W.3d 96, 101 (Tex.
1999); Marine Creek Partners, Ltd. v. Caldwell, 926 S.W.2d 793, 796
(Tex. App.CFort
Worth 1996, no writ).





[17]Mays
v. Pierce, 154 Tex. 487, 494, 281 S.W.2d 79, 82 (1955).





[18]See
Holman v. Meridian Oil, Inc., 988 S.W.2d 802, 807 (Tex.
App.CSan
Antonio 1999, pet. denied) (holding that a Aterm or covenant will not be
implied unless it appears from the express terms of the contract that such term
or covenant was clearly contemplated@); Tips v. Hartland
Developers, Inc., 961 S.W.2d 618, 622 (Tex. App.CSan
Antonio 1998, no pet.) (holding that, while implied covenants are to be made Asparingly,@ they
Awill
be found where necessary to effectuate the parties=
intentions and purposes in contracting@).





[19]See
West v. Brenntag Sw., Inc., 168 S.W.3d 327, 337 (Tex. App.CTexarkana
2005, pet. denied); ABB Kraftwerke Aktiengesellschaft v. Brownsville Barge
& Crane, Inc., 115 S.W.3d 287, 293 (Tex. App.CCorpus
Christi 2003, pet. denied).





[20]N.
Natural Gas Co. v. Conoco, Inc., 986 S.W.2d 603, 607 (Tex.
1998); ABB Kraftwerke, 115 S.W.3d at 293.





[21]West, 168
S.W.3d at 337; ABB Kraftwerke, 115 S.W.3d at 293.





[22]Tex.
Gas Utils. Co. v. Barrett, 460 S.W.2d 409, 412 (Tex. 1970).





[23]The
Estate contends that the contract is an option contract.  RaceTrac does not dispute this
characterization.  We agree that it is an
option contract.  See Cadle Co. v.
Harvey, 46 S.W.3d 282, 286 (Tex. App.CFort Worth 2001, pet. denied)
(holding that the test for determining whether a contract is an option contract
or a contract for the sale of real estate is whether the seller must accept a
stipulated sum in full settlement of the buyer=s
liability for default); Tabor v. Ragle, 526 S.W.2d 670, 676 (Tex. Civ.
App.CFort
Worth 1975, writ ref=d
n.r.e.) (same).  The contract provides, AIn
the event the sale of the Contract Property is not consummated . . . due to
[RaceTrac=s]
default, [Martin] shall be entitled to retain the Earnest Money as full
liquidated damages for such default and [RaceTrac] shall be relieved from all
further liability . . . .@ 





[24]Hott
v. Pearcy/Christon, Inc., 663 S.W.2d 851, 853 (Tex. App.CDallas
1983, writ ref=d
n.r.e.).





[25]Id. 





[26]Culbertson
v. Brodsky, 788 S.W.2d 156, 157 (Tex. App.CFort
Worth 1990, writ denied); Hott, 663 S.W.2d at 853.





[27]See
Hott, 663 S.W.2d at 853B54 (holding that the effect
of limiting liability in a contract to purchase land results in an option to
purchase, revocable at will of seller, unless and until independent
consideration is paid).





[28]Id. at
854.





[29]See
Smith v. Hues, 540 S.W.2d 485, 490 (Tex. Civ. App.CHouston
[14th Dist.] 1976, writ ref=d n.r.e.) (holding that
option contract was not unenforceable because it lacked mutuality of
obligation); Colligan v. Smith, 366 S.W.2d 816, 818B20
(Tex. Civ. App.CFort
Worth 1963, writ ref=d
n.r.e.) (holding that an option to purchase land is unilateral in nature, and
its validity is not dependent upon mutuality of obligation).  





[30]See
Hott, 663 S.W.2d at 853B54 (explaining that if
independent consideration is paid for an option, it becomes irrevocable, and A[w]hen
the optionee gives notice or otherwise complies with the terms and conditions of
the optionCregardless
of the existence of consideration for the optionCa
bilateral executory contract is formed@); Hues, 540 S.W.2d at
490 (holding that if the option is properly accepted, the optionor is bound). 





[31]See
Hott, 663 S.W.2d at 853B54; Hues, 540 S.W.2d
at 490. 





[32]Tabor, 526
S.W.2d at 675B76.





[33]Burr
v. Greenland, 356 S.W.2d 370, 375 (Tex. Civ. App.CEl
Paso 1962, writ ref=d
n.r.e.); Smith v. Nash, 571 S.W.2d 372, 375 (Tex. Civ. App.C
Texarkana 1978, no writ).





[34]Adams
v. Abbott, 151 Tex. 601, 605B06,
254 S.W.2d 78, 80B81
(Tex. 1952); Langley v. Norris, 141 Tex. 405, 413, 173 S.W.2d 454, 458B59
(Tex. 1943); Nash, 571 S.W.2d at 375.





[35]Adams, 151
Tex. at 605, 254 S.W.2d at 80; Hues, 540 S.W.2d at 490.





[36]See
Adams, 151 Tex. at 605B06, 254 S.W.2d at 80B81. 





[37]In
its live pleading at the time of trial, the Estate pleaded fourteen different
affirmative defenses, but it did not plead the rule against perpetuities or
illegality.  See Tex. R. App. P. 33.1(a); Bushell v.
Dean, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh=g).





[38]See Tex. R. Civ. P. 67; Bell v. Meeks,
725 S.W.2d 179, 179B80
(Tex. 1987); Bowles v. Reed, 913 S.W.2d 652, 659B60
(Tex. App.CWaco
1995, writ denied). 





[39]See
Mattern v. Herzog, 367 S.W.2d 312, 314 (Tex. 1963).





[40]KMI
Cont=l
Offshore Prod. Co. v. ACF Petroleum Co., 746 S.W.2d 238, 243 (Tex.
App.CHouston
[1st Dist.] 1987, writ denied); Nash, 571 S.W.2d at 375.





[41]Although
the Estate does not designate this argument as a challenge to the sufficiency
of the evidence, we will review it under the legal and factual sufficiency
standards.  See Pool v. Ford Motor Co.,
715 S.W.2d 629, 633 (Tex. 1986) (op. on reh=g) (liberally construing
issue in party=s
brief); Holley v. Watts, 629 S.W.2d 694, 696 (Tex. 1982) (directing us
to consider both the wording of party=s points and argument in
order Ato
determine as best we can@
issue party intended to raise).  





[42]Uniroyal
Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334 (Tex.
1998), cert. denied, 526 U.S. 1040 (1999); Robert W. Calvert, "No
Evidence" and "Insufficient Evidence" Points of Error,
38 TEX. L. REV. 361, 362B63
(1960).





[43]City
of Keller v. Wilson, 168 S.W.3d 802, 807, 827 (Tex. 2005).





[44]Garza
v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965).





[45]Mar.
Overseas Corp. v. Ellis, 971 S.W.2d 402, 406B07
(Tex.), cert. denied, 525 U.S. 1017 (1998)





[46]See McMillan
v. Dooley, 144 S.W.3d 159, 178 (Tex. App.CEastland
2004, pet. denied); Tex. State Optical, Inc. v. Wiggins, Inc., 882
S.W.2d 8, 10B11
(Tex. App.CHouston
[1st Dist.] 1994, no writ).





[47]Chapman
v. Olbrich, 217 S.W.3d 482, 491 (Tex. App.CHouston
[14th Dist.] 2006, no pet.); Krayem v. USRP (PAC), L.P., 194 S.W.3d 91,
94 (Tex. App.CDallas
2006, pet. denied); 17090 Parkway, Ltd. v. McDavid, 80 S.W.3d
252, 256 (Tex. App.CDallas
2002, pet. denied).





[48]Langley
v. Norris, 167 S.W.2d 603, 609B10
(Tex. Civ. App.CEastland
1942), aff=d, 141
Tex. 405, 173 S.W.2d 454 (1943).





[49]See
City of Keller, 168 S.W.3d at 819.





[50]Dow
Chem. Co. v. Francis, 46 S.W.3d 237, 241 (Tex. 2001); Sterner v.
Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989).





[51]Dow
Chem. Co., 46 S.W.3d at 241; Sterner, 767 S.W.2d at
690.





[52]Dow
Chem. Co., 46 S.W.3d at 241; Sterner, 767 S.W.2d at
690.





[53]Dow
Chem. Co., 46 S.W.3d at 241.





[54]Tex. R. Civ. P. 278; Union Pac. R.R. Co.
v. Williams, 85 S.W.3d 162, 166 (Tex. 2002).





[55]Tex. R. Civ. P. 277; In re V.L.K., 24
S.W.3d 338, 341 (Tex. 2000); Tex. Dep=t of
Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990); Cimarron
Country Prop. Owners Ass=n v. Keen, 117
S.W.3d 509, 511 (Tex. App.CBeaumont 2003, no pet.); Ryan
Mortgage Investors v. Fleming-Wood, 650 S.W.2d 928, 932B33
(Tex. App.CFort
Worth 1983, writ ref=d
n.r.e.).





[56]See,
e.g., TXI Transp. Co. v. Hughes, 224 S.W.3d 870, 902B03
(Tex. App.CFort
Worth 2007, pet. filed); Pitman v. Lightfoot, 937 S.W.2d 496, 519B20
(Tex. App.CSan
Antonio 1996, writ denied) (citing Island Recreational Dev. Corp. v.
Republic of Tex. Sav. Ass=n, 710
S.W.2d 551 (Tex. 1986)).





[57]See
TXI Transp. Co., 224 S.W.3d at 902B03; Pitman,
937 S.W.2d at 519B20.





[58]See
TXI Transp. Co., 224 S.W.3d at 902B03; Pitman,
937 S.W.2d at 519B20. 





[59]Brownwood
Ross Co. v. Maverick County, 936 S.W.2d 42, 45 (Tex. App.CSan
Antonio 1996, writ denied) (holding that what constitutes consideration is a
question of law); Duncan Land & Exploration, Inc. v. Littlepage, 984
S.W.2d 318, 328 (Tex. App.CFort Worth 1998, pet. denied)
(holding that jury instruction on question of law was unnecessary); Lone
Star Steel Co. v. Scott, 759 S.W.2d 144, 157 (Tex. App.CTexarkana
1988, writ denied) (holding that interpretation of a contract is a matter of
law).   





[60]E.g., Sullivan
v. Barnett, 471 S.W.2d 39, 44 (Tex. 1971) (holding that there is no need to
submit issue to the jury when facts are undisputed or conclusively established).





[61]Tex. R. Civ. P. 278; Hyundai Motor Co. v.
Rodriguez, 995 S.W.2d 661, 663 (Tex. 1999). 





[62]H.E.
Butt Grocery Co. v. Bilotto, 985 S.W.2d 22, 23 (Tex. 1998); Redwine
v. AAA Life Ins. Co., 852 S.W.2d 10, 14 (Tex. App.CDallas
1993, no writ).





[63]Tex. R. App. P. 44.1(a); Bed, Bath, &
Beyond, Inc. v. Urista, 211 S.W.3d 753, 757 (Tex. 2006); Reinhart v.
Young, 906 S.W.2d 471, 473 (Tex. 1995); Styers v. Schindler Elevator
Corp., 115 S.W.3d 321, 326 (Tex. App.CTexarkana 2003, pet. denied).






[64]See Tex. R. App. P. 44.1(a); Bed, Bath,
& Beyond, Inc., 211 S.W.3d at 757.





[65]Because
we are affirming the trial court=s judgment, it is unnecessary
for us to reach the Estate=s arguments that it is
entitled to attorney=s
fees.  See Tex. R. App. P. 47.1.