

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-06-124-CV

ALICE LONGFELLOW, INDEPENDENT                    APPELLANT
EXECUTRIX OF THE ESTATE OF
CHARLEY G. MARTIN

V.

RACETRAC PETROLEUM, INC. AND                    APPELLEES
WAL-MART STORES EAST, INC.

------------

### FROM PROBATE COURT NO. 1 OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Alice Longfellow, independent executrix of the estate of Charley G.

Martin, appeals from the trial court's amended judgment in favor of RaceTrac

---

[1] *See* TEX. R. APP. P. 47.4.

Petroleum, Inc., granting RaceTrac specific performance of the parties' contract and attorney's fees.[2] We affirm.

## I. Background

In May 1998, Martin and RaceTrac signed a "Real Estate Purchase Contract" (hereinafter sometimes referred to as the RaceTrac contract), providing for the sale of approximately sixteen acres of Martin's land in Grand Prairie for $1 million. Longfellow initially acted as Martin's agent under a power of attorney and, later, as executrix of his estate. Following execution of the contract, RaceTrac paid $10,000.00 earnest money as required under the contract. RaceTrac also expended over $36,000.00 on engineering and environmental work on the property, retained a title company, and obtained a survey.

Under the contract, RaceTrac had a ninety-day "permit period" after receipt of the survey to obtain "all governmental permits, licenses, variances, and approvals" necessary for it to operate a store on the contract property. If RaceTrac was unable to obtain the required permits within ninety days, the contract allowed it, "by giving notice to Seller, [to] extend the Permit Period for an additional sixty (60) days." In the event RaceTrac extended the permit

---

[2] We refer to appellant as "the Estate," except where a distinction between "Martin" and "Longfellow" is appropriate.

period and was able to obtain the permits, the contract provided that "[c]losing shall be held within ten (10) days following the end of the Permit Period."

The contract also contained a gas restriction that provided as follows:

> Seller will execute . . . at or prior to Closing, a restriction in recordable form which will run with the land prohibiting . . . a retail outlet for motor fuels or a convenience store . . . on any land now owned or controlled by Seller or Seller's affiliates within one mile of any boundary of the Contract Property. Should Seller or any of Seller's affiliates sell or lease prior to Closing, all or any part of such restricted property, such sale or lease shall be subject to Purchaser's rights under this Contract and Seller shall ensure that any lease or instrument of conveyance of such property shall specifically so state.

RaceTrac's general counsel, Claude Czaja, testified that the gas restriction was very important to RaceTrac and is common in the industry. Longfellow admitted that she did not read the contract but signed it on the advice of her attorneys, and she claimed that she was initially unaware of the gas restriction.[3]

RaceTrac received a survey of the contract property on September 1, 1998, and notified Martin and Longfellow in writing that the permit period would run through November 30, 1998. RaceTrac then began the process of applying for a property plat from the City of Grand Prairie. On November 20, 1998, RaceTrac notified Longfellow in writing that it was exercising its right to extend the permit period for an additional sixty days, from November 30, 1998,

---

[3] Martin also signed the contract.

through January 29, 1999, and Longfellow did not object. Pursuant to the contract, therefore, "so long as RaceTrac was able to obtain the required permits," closing was to be within ten days after the permit period expired, or by February 8, 1999.

Czaja testified that RaceTrac learned of Martin's November 20, 1998 death the week before closing was to occur. In preparation for closing, RaceTrac requested an updated title commitment and asked the title company whether Longfellow could sign the closing documents in light of Martin's death. On February 3, 1999, the title company indicated that taxes might be due because of the size of Martin's estate, and RaceTrac could either close the deal and have the proceeds held in escrow until the title company received the Estate's inventory and appraisement or, if the title company received the documents, it could pay the taxes. There was also a mechanic's lien on the property, and the Estate would have to resolve both problems at closing.[4] The following day, February 4, 1999, RaceTrac notified Longfellow and her

---

[4] If there had been no estate tax issue, the title company would have withheld funds from the purchase price to pay the mechanic's lien. But, with the estate tax problem, the title company required the entire $1 million purchase price to be escrowed and the Estate to "bring that $140,000 to the closing" to cover the mechanic's lien.

4

attorneys of the two "matters affecting title" that the Estate needed to address.[5]

On February 5, 1999, Longfellow's then-attorney Gilbert Smith told Czaja "in no uncertain terms" that the Estate was not going to come to the closing table. Specifically, Smith said that the Estate did not have the inventory and appraisement in order, that those documents could take a year to complete, and that the Estate did not have $140,000.00 to pay off the mechanic's lien.[6] RaceTrac immediately notified the Estate in writing that it would extend the time for closing, pursuant to the contract, to allow time to remove the title objections.[7] RaceTrac's letter further stated, "Purchaser stands ready to close the transaction upon Seller's satisfaction of the above-referenced title matters." Czaja conceded, however, that RaceTrac never tendered the $1 million purchase price.

---

[5] The contract required the Estate to deliver "good and marketable fee simple title . . . free and clear of all liens [and] encumbrances" at closing.

[6] Longfellow later testified, however, that the Estate had $100,000.00 or more at the time of Martin's death.

[7] Under the terms of the contract, the Estate had fifteen days from receipt of RaceTrac's written notice to cure the title objections. If the Estate failed to satisfy the title objections within that time, one remedy available to RaceTrac was to extend the time for closing.

Thereafter, in March 1999, the Estate settled a separate lawsuit with GSW & 20 Partners, Ltd., with whom Martin had contracted to sell 107 acres of land, including the sixteen acres that are the subject of the RaceTrac contract.[8] Pursuant to the GSW settlement agreement, Blackhawk Partners I, Ltd., would buy 75 acres of property from the Estate.[9] Blackhawk, in turn, agreed to sell part of the property it was purchasing to Wal-Mart Stores East, Inc., with closing to be held in May 1999. The land Wal-Mart planned to purchase was located within approximately one-half mile of the land under contract with RaceTrac.

The first time Blackhawk learned of RaceTrac's gas restriction was immediately prior to its closing with Wal-Mart. Although Wal-Mart was willing to purchase part of the property with the gas restriction in place, the covenant made the property less valuable to Wal-Mart. Accordingly, the parties agreed that $450,000.00 of Wal-Mart's purchase price would be placed into an escrow account pending resolution of the RaceTrac-Estate litigation.

Meanwhile, continuing to believe that the Estate was unable to close because it lacked sufficient funds to pay the mechanic's lien, Czaja contacted

---

[8] GSW sued Martin for breach of contract in 1997.

[9] Some of the same individuals who formed GSW also ran Blackhawk.

6

a second title insurance company in an effort to facilitate closing. On May 20, 1999, RaceTrac informed the Estate that the second title company offered to write a title policy that would require it to place only the *net* proceeds into escrow. RaceTrac also offered to waive a provision in the contract that required the Estate to give RaceTrac a legal description of its other property within one mile of the contract property. The Estate rejected RaceTrac's offer on June 7, 1999.

Thomas Metcalfe, a real estate broker, testified that Longfellow told him in August 1999 that she was aware of the gas restriction in the RaceTrac contract, knew that Wal-Mart wanted to sell gas on the property it was buying, and that if it became an issue she would simply not close on the contract with RaceTrac. Longfellow denied speaking with Metcalfe and impugned his "business ethics."

On September 27, 1999, Longfellow and her then-attorney Michael McCue flew to Atlanta for a meeting at RaceTrac's corporate office. Czaja testified that Longfellow demanded that RaceTrac remove the gas restriction, but RaceTrac refused to renegotiate the contract. Longfellow claimed that she went to the meeting to close on the contract, but RaceTrac refused. The meeting lasted approximately ten minutes, and at the conclusion of the

7

meeting, McCue handed Czaja a typed letter purporting to terminate the contract, claiming it was unenforceable.

Brad Bowen, who was associated with both GSW and Blackhawk, testified that Longfellow "sequestered" Martin, preventing him from outside contact. Further, Bowen did not trust Longfellow because she was "evasive" when asked for proof of her power of attorney. Bowen described Longfellow as having "irrational" responses and being "a loose cannon," "very unreasonable," "volatile," "difficult to work with", and "impossible to deal with." During her own testimony, Longfellow claimed that she was the victim of a "conspiracy to do land fraud" perpetrated by Martin's longtime accountant, his longtime attorney, Bowen, RaceTrac, and several of Longfellow's previous attorneys, and she contended that she had been physically threatened.

In 2001, RaceTrac sued the Estate, alleging breach of the contract and seeking specific performance, damages, and attorney's fees. The Estate counterclaimed, seeking a declaratory judgment that the contract was unenforceable and asserting slander of title, tortious interference with contract, and an action to quiet title.

In 2004, the Estate joined Wal-Mart as a party to the litigation. Shortly before trial, Wal-Mart entered into separate Rule 11 agreements with both the Estate and RaceTrac providing that Wal-Mart would not attend the trial and that

8

Wal-Mart and the other party to the agreement would not pursue any claims against the other. Further, Wal-Mart and the Estate agreed that if RaceTrac obtained judgment for specific performance and the gas restriction remained in place, then Wal-Mart would be entitled to the $450,000.00 escrowed funds. Alternatively, if RaceTrac did not obtain judgment for specific performance and the gas restriction was lifted, the escrowed funds would be paid to the Estate.

Following a three-day trial, the jury answered four special issues favorably to RaceTrac.[10] Thereafter, the trial court rendered an amended final judgment granting RaceTrac specific performance and attorney's fees. The judgment additionally provided that the funds in escrow be released to Wal-Mart.

## II. The Estate's Issues

The Estate raises twenty issues. Issues one through ten require us to construe the contract and review the sufficiency of the evidence to support certain jury findings. Issues eleven through sixteen complain of the jury charge. The remaining four issues challenge the award of attorney's fees to RaceTrac and seek recovery of attorney's fees and earnest money from RaceTrac and Wal-Mart.

## III. Construction of the RaceTrac Contract

---

[10] The jury also answered two additional questions pertaining to attorney's fees.

9

We will begin our analysis with the following issues requiring us to construe the RaceTrac contract:

- RaceTrac is not entitled to specific performance because the option contract lacks mutuality of remedy;

- The RaceTrac contract is unenforceable because it lacks mutuality of obligation;

- The RaceTrac contract is unenforceable because it violates the rule against perpetuities;

- The option was revocable by the Estate at any time before RaceTrac exercised the option because RaceTrac never paid independent consideration for the option; and

- RaceTrac's demand that the Estate produce its inventory and appraisement or escrow the sales proceeds was not permitted by the contract.

## A. Rules of Contract Construction

The interpretation of an unambiguous contract is a question of law to be determined by the court.[11] When a contract is worded in a manner that allows it to be given a certain or definite legal meaning, it is not ambiguous and the court will construe it as a matter of law.[12] A contract is ambiguous if, after applying the pertinent rules of construction, it is subject to two or more

---

[11] *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 423 (Tex. 2000); *FPL Energy Upton Wind I, L.P. v. City of Austin ex rel. Elec. Util. Dep't*, 240 S.W.3d 456, 463 (Tex. App.—Amarillo 2007, no pet.).

[12] *Gulf Ins. Co.*, 22 S.W.3d at 423; *FPL Energy*, 240 S.W.3d at 463.

reasonable interpretations.[13] In determining whether a contract is ambiguous, the court should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.[14]

An unambiguous contract must be enforced as written, examining the entire document and giving terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense.[15] Language is given its regular grammatical meaning unless to do so would defeat the parties' objective intent as expressed in the written contract.[16] When we have the choice of construing a contract as valid or as void, we construe it in such a way as to make it valid.[17] We may imply terms or covenants in a contract "sparingly," only where they were "clearly

---

[13] *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996); *FPL Energy*, 240 S.W.3d at 463.

[14] *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999).

[15] *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996).

[16] *DeWitt County Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96, 101 (Tex. 1999); *Marine Creek Partners, Ltd. v. Caldwell*, 926 S.W.2d 793, 796 (Tex. App.—Fort Worth 1996, no writ).

[17] *Mays v. Pierce*, 154 Tex. 487, 494, 281 S.W.2d 79, 82 (1955).

contemplated" or "necessary to effectuate [the] parties' intentions and purposes in contracting."[18]

### B. Consideration

The Estate argues that the RaceTrac option contract is unenforceable and revocable at will because it lacked consideration.

As a general rule, a contract must be based on valid consideration, or mutuality of obligation.[19] Consideration is defined as either a benefit to the promisor or a loss or detriment to the promisee.[20] A contract that lacks consideration lacks mutuality of obligation and is unenforceable.[21] There is a

---

[18] *See Holman v. Meridian Oil, Inc.*, 988 S.W.2d 802, 807 (Tex. App.—San Antonio 1999, pet. denied) (holding that a "term or covenant will not be implied unless it appears from the express terms of the contract that such term or covenant was clearly contemplated"); *Tips v. Hartland Developers, Inc.*, 961 S.W.2d 618, 622 (Tex. App.—San Antonio 1998, no pet.) (holding that, while implied covenants are to be made "sparingly," they "will be found where necessary to effectuate the parties' intentions and purposes in contracting").

[19] *See West v. Brenntag Sw., Inc.*, 168 S.W.3d 327, 337 (Tex. App.—Texarkana 2005, pet. denied); *ABB Kraftwerke Aktiengesellschaft v. Brownsville Barge & Crane, Inc.*, 115 S.W.3d 287, 293 (Tex. App.—Corpus Christi 2003, pet. denied).

[20] *N. Natural Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603, 607 (Tex. 1998); *ABB Kraftwerke*, 115 S.W.3d at 293.

[21] *West*, 168 S.W.3d at 337; *ABB Kraftwerke*, 115 S.W.3d at 293.

presumption that a written contract is supported by consideration, and we construe a contract in favor of mutuality of obligation.[22]

An option contract[23] has two components: (1) the underlying contract which is not binding until accepted; and (2) the covenant to hold open to the optionee the opportunity to accept.[24] The option agreement component states the terms upon which the seller is willing to sell his land, if the optionee elects to accept within the agreed time.[25] Both the option and the underlying contract must be supported by consideration.[26] If no consideration is paid, the option

---

[22] *Tex. Gas Utils. Co. v. Barrett*, 460 S.W.2d 409, 412 (Tex. 1970).

[23] The Estate contends that the contract is an option contract. RaceTrac does not dispute this characterization. We agree that it is an option contract. *See Cadle Co. v. Harvey*, 46 S.W.3d 282, 286 (Tex. App.—Fort Worth 2001, pet. denied) (holding that the test for determining whether a contract is an option contract or a contract for the sale of real estate is whether the seller must accept a stipulated sum in full settlement of the buyer's liability for default); *Tabor v. Ragle*, 526 S.W.2d 670, 676 (Tex. Civ. App.—Fort Worth 1975, writ ref'd n.r.e.) (same). The contract provides, "In the event the sale of the Contract Property is not consummated . . . due to [RaceTrac's] default, [Martin] shall be entitled to retain the Earnest Money as full liquidated damages for such default and [RaceTrac] shall be relieved from all further liability . . . ."

[24] *Hott v. Pearcy/Christon, Inc.*, 663 S.W.2d 851, 853 (Tex. App.—Dallas 1983, writ ref'd n.r.e.).

[25] *Id.*

[26] *Culbertson v. Brodsky*, 788 S.W.2d 156, 157 (Tex. App.—Fort Worth 1990, writ denied); *Hott*, 663 S.W.2d at 853.

13

is revocable during its term until exercised.[27] Once consideration passes, the option becomes irrevocable.[28]

Option contracts are different from other contracts in that an option contract lacks mutuality of obligation at its inception.[29] In a contract where the buyer's liability is limited to the forfeiture of earnest money, mutuality of obligation is created when independent consideration is paid or when the optionee exercises performance.[30]

RaceTrac exercised performance in February 1999 by notifying the Estate that it intended to close on February 8, 1999, the date contemplated by the contract, and by making appropriate preparations for closing. After the Estate

---

[27] *See Hott*, 663 S.W.2d at 853–54 (holding that the effect of limiting liability in a contract to purchase land results in an option to purchase, revocable at will of seller, unless and until independent consideration is paid).

[28] *Id.* at 854.

[29] *See Smith v. Hues*, 540 S.W.2d 485, 490 (Tex. Civ. App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.) (holding that option contract was not unenforceable because it lacked mutuality of obligation); *Colligan v. Smith*, 366 S.W.2d 816, 818–20 (Tex. Civ. App.—Fort Worth 1963, writ ref'd n.r.e.) (holding that an option to purchase land is unilateral in nature, and its validity is not dependent upon mutuality of obligation).

[30] *See Hott*, 663 S.W.2d at 853–54 (explaining that if independent consideration is paid for an option, it becomes irrevocable, and "[w]hen the optionee gives notice or otherwise complies with the terms and conditions of the option—regardless of the existence of consideration for the option—a bilateral executory contract is formed"); *Hues*, 540 S.W.2d at 490 (holding that if the option is properly accepted, the optionor is bound).

refused to close, RaceTrac extended the time for closing, as it was permitted to do under the contract, to allow the Estate more time to cure the title problems.  Once RaceTrac exercised its option through these actions, mutuality of obligation was created.[31]  For these reasons, we hold that the RaceTrac contract was supported by consideration.

## C.  Specific Performance and Mutuality of Remedy

The Estate next argues that RaceTrac was not entitled to specific performance because the contract lacked mutuality of remedy.  The Estate contends that the contract did not permit the Estate to seek specific performance, and, therefore, RaceTrac cannot be entitled to specific performance either.

The RaceTrac contract provides, "[The Estate] and [RaceTrac] acknowledge that it is impossible to measure the damages which would accrue to RaceTrac by reason of [the Estate's] default hereunder.  Accordingly, [RaceTrac] may enforce this contract and [the Estate's] obligations hereunder in an action seeking specific performance."

The general rule in Texas is that if one party breaches a contract for the sale of real estate, the other party can enforce the contract through specific

---

[31] *See Hott*, 663 S.W.2d at 853–54; *Hues*, 540 S.W.2d at 490.

performance.[32] Specific performance will be granted only in cases where there is a mutuality of remedy.[33] The absence of mutuality of remedy when a contract is executed, however, does not make the contract unenforceable so long as mutuality of remedy is subsequently supplied.[34] Mutuality of remedy may be subsequently supplied by performance of the party who seeks specific performance.[35]

When RaceTrac performed under the contract and stood ready, willing, and able to close, mutuality of remedy was supplied, and the Estate could have enforced the contract against RaceTrac.[36] We, therefore, hold that specific performance was a proper remedy in this case.

---

[32] *Tabor*, 526 S.W.2d at 675–76.

[33] *Burr v. Greenland*, 356 S.W.2d 370, 375 (Tex. Civ. App.—El Paso 1962, writ ref'd n.r.e.); *Smith v. Nash*, 571 S.W.2d 372, 375 (Tex. Civ. App.— Texarkana 1978, no writ).

[34] *Adams v. Abbott*, 151 Tex. 601, 605–06, 254 S.W.2d 78, 80–81 (Tex. 1952); *Langley v. Norris*, 141 Tex. 405, 413, 173 S.W.2d 454, 458–59 (Tex. 1943); *Nash*, 571 S.W.2d at 375.

[35] *Adams*, 151 Tex. at 605, 254 S.W.2d at 80; *Hues*, 540 S.W.2d at 490.

[36] *See Adams*, 151 Tex. at 605–06, 254 S.W.2d at 80–81.

## D. Rule Against Perpetuities

The Estate argues that the option contract is unenforceable because it violated the rule against perpetuities. The Estate has waived this complaint, however, because it was not raised in the trial court.[37]

The Estate, nevertheless, contends that Czaja's testimony established that the contract was illegal and, therefore, the rule against perpetuities issue was tried by consent. We disagree. On cross-examination, Czaja disputed the Estate's attorney's suggestion that the contract could "stay alive forever"; he contended that if a party did nothing it would eventually be in default; and he noted that the contract specifically provided that "time is of the essence." This testimony alone was insufficient to bring the rule against perpetuities before the trial court by the active assistance of both parties.[38]

The Estate further contends that the contract is illegal on its face because a contractual provision allowed RaceTrac to extend indefinitely the time for closing. The provision in question provides as follows:

---

[37] In its live pleading at the time of trial, the Estate pleaded fourteen different affirmative defenses, but it did not plead the rule against perpetuities or illegality. *See* TEX. R. APP. P. 33.1(a); *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g).

[38] *See* TEX. R. CIV. P. 67; *Bell v. Meeks*, 725 S.W.2d 179, 179–80 (Tex. 1987); *Bowles v. Reed*, 913 S.W.2d 652, 659–60 (Tex. App.—Waco 1995, writ denied).

17

If [RaceTrac] has objections to the title or survey of the Contract Property, a written statement of such objections shall be furnished to [the Estate], in which event [the Estate] shall have fifteen (15) days after receipt of said statement to satisfy all objections and, if [the Estate] fails to satisfy such objections within that time then: [RaceTrac] may . . . extend the time for Closing to allow [the Estate] or [RaceTrac] *additional time* to remove such objections . . . . (emphasis supplied)

We construe a contract in a way that renders it enforceable rather than invalid even where the rule against perpetuities is involved.[39] In the absence of a provision of time for performance, the law implies that a reasonable time was intended.[40]

We hold that the term "additional time" in the RaceTrac contract was intended by the parties to provide a reasonable time for performance. Therefore, the contract was not illegal on its face.

### E. Inventory and Appraisement

The Estate next contends that RaceTrac's requirements that the Estate provide an inventory and appraisement or escrow the sales proceeds were not permitted by the contract. Additionally, it argues that the contract only permitted RaceTrac to provide additional title or survey objections based on

---

[39] *See Mattern v. Herzog*, 367 S.W.2d 312, 314 (Tex. 1963).

[40] *KMI Cont'l Offshore Prod. Co. v. ACF Petroleum Co.*, 746 S.W.2d 238, 243 (Tex. App.—Houston [1st Dist.] 1987, writ denied); *Nash*, 571 S.W.2d at 375.

updated title commitments or surveys, and RaceTrac failed to prove that the additional requirements resulted from an updated title commitment or survey.

The RaceTrac contract states,

> At closing . . . [the Estate] shall execute and deliver to [RaceTrac] a General Warranty Deed, satisfactory in form and substance to [RaceTrac], conveying good and marketable fee simple title to the Contract Property, free and clear of all liens, encumbrances, easements and restrictions of every nature and description. . . . [The Estate] shall execute and deliver with the deed such other instruments as may be required by the title insurance company to issue its policy of title insurance and any and all other documents deemed reasonably necessary by [RaceTrac] to consummate the transactions contemplated herein.

The plain language of the contract required the Estate to provide at closing "good and marketable title" and to deliver any instruments required by the title insurance company in order to issue a title insurance policy. Therefore, the requirements that the Estate provide an inventory and appraisement as required by the title insurance company were authorized by the contract. The evidence is undisputed that the title insurance company required the Estate's inventory and appraisement, or to hold the proceeds in escrow, in order to issue a title insurance policy. Thus, we hold that the RaceTrac contract allowed RaceTrac to demand that the Estate produce these documents, or allow the proceeds to be escrowed in order to close.

19

## IV. Issues Challenging the Evidence Supporting the Jury Findings

The jury answered the following four questions:

SPECIAL QUESTION # 1:

On or after February 8, 1999, did Longfellow fail to comply with the Contract with Racetrac?

Answer "Yes" or "No"   Yes

If you answered Special Question #1 "Yes" then answer Special Question #2, otherwise do not answer Special Question #2.

SPECIAL QUESTION # 2:

Was Longfellow's failure to comply excused?

Answer "Yes" or "No"   No

SPECIAL QUESTION # 3:

Was Racetrac ready, willing and able to perform its obligations under the Contract on: (Answer "Yes" or "No" for both):

A.  February 8, 1999                    Yes

B.  February 9, 1999 through
    September 27, 1999                   Yes

SPECIAL QUESTION # 4:

Did Racetrac fail to comply with the Contract?

Answer "Yes" or "No"   No

20

## A. RaceTrac's Performance

The Estate argues that the jury's answers to the first three questions should be disregarded because RaceTrac failed to tender performance or payment. According to the Estate, the contract expired because RaceTrac failed to timely exercise its contractual rights. Alternatively, the Estate argues that the contract was revoked and terminated before RaceTrac purportedly exercised its option rights.

We may sustain a challenge to a jury finding based on legal sufficiency[41] only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.[42] In determining whether

---

[41] Although the Estate does not designate this argument as a challenge to the sufficiency of the evidence, we will review it under the legal and factual sufficiency standards. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 633 (Tex. 1986) (op. on reh'g) (liberally construing issue in party's brief); *Holley v. Watts*, 629 S.W.2d 694, 696 (Tex. 1982) (directing us to consider both the wording of party's points and argument in order "to determine as best we can" issue party intended to raise).

[42] *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960).

there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable fact-finder could and disregard evidence contrary to the finding unless a reasonable fact-finder could not.[43]

An assertion that the evidence is factually insufficient to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered.[44] We are required to consider all of the evidence in the case in making this determination, not just the evidence that supports the finding.[45]

The exercise of an option to purchase must be positive, unconditional, and unequivocal, and is equivalent to the acceptance of an offer.[46] When one party refuses to perform its obligations under a contract, however, the other party need not tender performance before suing to enforce the contract through

---

[43] *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

[44] *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

[45] *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex.), *cert. denied*, 525 U.S. 1017 (1998)

[46] *See McMillan v. Dooley*, 144 S.W.3d 159, 178 (Tex. App.—Eastland 2004, pet. denied); *Tex. State Optical, Inc. v. Wiggins, Inc.*, 882 S.W.2d 8, 10–11 (Tex. App.—Houston [1st Dist.] 1994, no writ).

specific performance.[47]  One of our sister courts has held, for example, that where a buyer of land performed all that the contract required of him except actually tender the purchase price, and was financially able to pay, but the seller refused to convey the land, the buyer was entitled to specific performance.[48]

The jury's findings that Longfellow failed to comply with the contract on or after February 8, 1999; that Longfellow's failure to comply was not excused; and that RaceTrac was ready, willing, and able to perform its obligations under the contract on February 8, 1999 through September 27, 1999, were supported by the following evidence:

Czaja testified that RaceTrac made appropriate preparations for closing in the week prior to February 8, 1999; that RaceTrac notified the Estate of its intention to close and the title objections revealed by the title company; that the Estate refused to close; that RaceTrac properly extended the time for closing to allow the Estate more time to cure the title problems; and that RaceTrac

---

[47] *Chapman v. Olbrich*, 217 S.W.3d 482, 491 (Tex. App.—Houston [14th Dist.] 2006, no pet.); *Krayem v. USRP (PAC), L.P.*, 194 S.W.3d 91, 94 (Tex. App.—Dallas 2006, pet. denied); *17090 Parkway, Ltd. v. McDavid*, 80 S.W.3d 252, 256 (Tex. App.—Dallas 2002, pet. denied).

[48] *Langley v. Norris*, 167 S.W.2d 603, 609–10 (Tex. Civ. App.—Eastland 1942), *aff'd*, 141 Tex. 405, 173 S.W.2d 454 (1943).

continued to try to close after February. The parties' written correspondence in the record fully corroborates Czaja's testimony.

Longfellow, on the other hand, asserted that she wanted to close the contract but RaceTrac refused, and she claimed that she was the victim of a conspiracy. The Estate also offered the testimony of RaceTrac's vice president of real estate, who indicated that RaceTrac did not intend to develop or market certain extra acreage included in the deal with the Estate. Further, the Estate called Chuck Hartley, Longfellow's employee who also attended the meeting in Atlanta. Hartley testified that RaceTrac had seven or eight people at the meeting, whereas Longfellow's party was comprised of only three. Hartley stated that Longfellow "wanted the deal to go through" but RaceTrac "kind of laughed at her." The Estate also called Czaja, who maintained his position that, at the meeting in Atlanta, Longfellow tried to renegotiate the contract without the gas restriction.

Czaja conceded that RaceTrac did not tender the purchase price, but maintained it had the financial ability to do so. RaceTrac argued in closing that the resolution of the case turned on whose version of events—Longfellow's or Czaja's—the jury believed. The jury, who is the sole judge of the credibility of

witnesses and may choose to believe one witness over another, evidently believed Czaja.[49]

Applying the appropriate legal and factual sufficiency standards of review, we hold that the evidence was sufficient to support the jury's findings that Longfellow failed to comply with the contract; that her failure was not excused; and that RaceTrac was ready, willing, and able to perform its obligations under the contract.

## B. RaceTrac's Exercise of the Sixty-Day Extension

The Estate argues that there was "no evidence" to support the jury's failure to find that RaceTrac did not comply with the RaceTrac contract. Specifically, the Estate contends that because there is no evidence showing that RaceTrac was entitled to the contractual sixty-day extension to the permit period, the contract expired on November 30, 1998, as a matter of law.

When a party attacks the legal sufficiency of an adverse finding on an issue on which it had the burden of proof, it must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue.[50] In reviewing a "matter of law" challenge, we must first examine the

---

[49] *See City of Keller*, 168 S.W.3d at 819.

[50] *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989).

record for evidence that supports the finding, while ignoring all evidence to the contrary.[51] If there is no evidence to support the finding, we then examine the entire record to determine if the contrary proposition is established as a matter of law.[52] We may sustain the point only if the contrary proposition is conclusively established.[53]

There is evidence in the record showing that RaceTrac complied with the terms of the contract in seeking the sixty-day extension. The contract allowed RaceTrac to extend the permit period upon written notice to Longfellow if RaceTrac was unable to obtain all required permits within the original ninety-day permit period, which was to expire on November 30, 1998. On November 13, 1998, the City of Grand Prairie notified RaceTrac that the matter would be submitted for a hearing before the city's planning and zoning commission on December 7, 1998, and indicated that a RaceTrac representative should attend the meeting. On November 20, 1998, RaceTrac notified the Estate in writing that it was exercising the extension. The Estate did not object to RaceTrac's efforts to extend the permit period.

---

[51] *Dow Chem. Co.*, 46 S.W.3d at 241; *Sterner*, 767 S.W.2d at 690.

[52] *Dow Chem. Co.*, 46 S.W.3d at 241; *Sterner*, 767 S.W.2d at 690.

[53] *Dow Chem. Co.*, 46 S.W.3d at 241.

We hold that, because there is some evidence that RaceTrac properly exercised its right to the sixty-day extension under the RaceTrac contract, there is evidence that supports the jury's challenged finding, and RaceTrac's failure to comply with the RaceTrac contract was not established as a matter of law.

## V.  Challenges to the Jury Charge

### A.  Omitted Questions

The Estate argues that the trial court abused its discretion by failing to submit jury questions asking whether RaceTrac was entitled to the contractual sixty-day extension; whether RaceTrac properly and finally accepted the contract and tendered performance, or finally accepted the option before the Estate terminated the contract; whether the contract was an option contract; and whether RaceTrac paid independent consideration for the options.

A party is entitled to a jury question or instruction if the pleadings and evidence raise an issue.[54] We review a trial court's decision to submit or refuse a particular question or instruction for an abuse of discretion, recognizing that whenever possible the trial court should submit a cause upon broad-form

---

[54] TEX. R. CIV. P. 278; *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002).

questions.[55]  The trial court does not abuse its discretion in refusing to submit questions that are adequately encompassed within broad-form questions it does submit.[56]

The question of whether RaceTrac complied with the terms of the contract was submitted to the jury, and the jury failed to find that RaceTrac did not comply with the contract.  This broad form question encompasses the issue of whether RaceTrac properly invoked the sixty-day extension.  We, therefore, hold that the trial court did not abuse its discretion by failing to submit a question asking specifically whether RaceTrac was entitled to the contractual sixty-day extension.[57]

Further, the jury found that Longfellow failed to comply with the RaceTrac contract, that her failure to comply was not excused, and that RaceTrac stood ready, wiling, and able to perform its obligations from February

---

[55] TEX. R. CIV. P. 277; *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000); *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990); *Cimarron Country Prop. Owners Ass'n v. Keen*, 117 S.W.3d 509, 511 (Tex. App.—Beaumont 2003, no pet.); *Ryan Mortgage Investors v. Fleming-Wood*, 650 S.W.2d 928, 932–33 (Tex. App.—Fort Worth 1983, writ ref'd n.r.e.).

[56] *See, e.g.*, *TXI Transp. Co. v. Hughes*, 224 S.W.3d 870, 902–03 (Tex. App.—Fort Worth 2007, pet. filed); *Pitman v. Lightfoot*, 937 S.W.2d 496, 519–20 (Tex. App.—San Antonio 1996, writ denied) (citing *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551 (Tex. 1986)).

[57] *See TXI Transp. Co.*, 224 S.W.3d at 902–03; *Pitman*, 937 S.W.2d at 519–20.

28

8, 1999 through September 27, 1999. The jury also failed to find that RaceTrac failed to comply with the contract. These findings adequately encompass the issues on acceptance and performance that the Estate argues should have been submitted. Therefore, the trial court did not abuse its discretion by failing to submit questions on those issues.[58]

The Estate further contends that the trial court erred by not submitting questions asking whether the contract was an option contract and whether the option contract was supported by consideration. Those are, however, questions of law which the trial court was not required to submit to the jury.[59] Moreover, the fact that the contract is an option contract was undisputed at trial. When issues are undisputed, there is no need to submit them to the jury.[60] We hold, therefore, that the trial court did not abuse its discretion in

---

[58] *See TXI Transp. Co.*, 224 S.W.3d at 902–03; *Pitman*, 937 S.W.2d at 519–20.

[59] *Brownwood Ross Co. v. Maverick County*, 936 S.W.2d 42, 45 (Tex. App.—San Antonio 1996, writ denied) (holding that what constitutes consideration is a question of law); *Duncan Land & Exploration, Inc. v. Littlepage*, 984 S.W.2d 318, 328 (Tex. App.—Fort Worth 1998, pet. denied) (holding that jury instruction on question of law was unnecessary); *Lone Star Steel Co. v. Scott*, 759 S.W.2d 144, 157 (Tex. App.—Texarkana 1988, writ denied) (holding that interpretation of a contract is a matter of law).

[60] *E.g.*, *Sullivan v. Barnett*, 471 S.W.2d 39, 44 (Tex. 1971) (holding that there is no need to submit issue to the jury when facts are undisputed or conclusively established).

refusing to submit the Estate's questions about whether the contract was an option contract and whether the option contract was supported by consideration.

## B. Erroneous Waiver Definition

The Estate asserts that the trial court's definition of "waiver" as "the voluntary relinquishment of a known right" was incomplete. According to the Estate, the definition should have included the second part of Texas Pattern Jury Charge 101.24 that states waiver is also "intentional conduct inconsistent with claiming the right."

A trial court is to include in its charge the questions, instructions, and definitions raised by the pleadings and evidence.[61] The trial court has considerable discretion in framing a jury charge and is given wide latitude to determine the propriety of explanatory instructions and definitions.[62]

An erroneous definition requires reversal only if it "probably caused the rendition of an improper judgment."[63] Assuming without deciding that the trial

---

[61] TEX. R. CIV. P. 278; *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 663 (Tex. 1999).

[62] *H.E. Butt Grocery Co. v. Bilotto*, 985 S.W.2d 22, 23 (Tex. 1998); *Redwine v. AAA Life Ins. Co.*, 852 S.W.2d 10, 14 (Tex. App.—Dallas 1993, no writ).

[63] TEX. R. APP. P. 44.1(a); *Bed, Bath, & Beyond, Inc. v. Urista*, 211 S.W.3d 753, 757 (Tex. 2006); *Reinhart v. Young*, 906 S.W.2d 471, 473 (Tex.

30

court erred by failing to include the second part of the definition of waiver, we hold that the Estate was not harmed by the alleged erroneous definition.

The issue of waiver was relevant to special question number two; this question asked, if the jury found that Longfellow failed to comply with the RaceTrac contract, whether her failure to comply was excused. The trial court instructed the jury that "[f]ailure to comply may be excused . . . if compliance is waived" and defined waiver as "the voluntary relinquishment of a known right."

The Estate argued in closing that Longfellow's failure to comply, if any, was excused because RaceTrac either repudiated the contract or waived compliance by its own refusal to close on the deal. A recurring theme throughout the Estate's closing argument was its assertion that RaceTrac improperly "tied up the land" by filing memorandums of contract in the Tarrant County deed records while refusing to close.

The submitted definition of waiver includes within its meaning the type of intentional conduct that the Estate argued RaceTrac committed. The act of voluntarily relinquishing a known right necessarily includes intentional conduct inconsistent with claiming the right.

---

1995); *Styers v. Schindler Elevator Corp.*, 115 S.W.3d 321, 326 (Tex. App.—Texarkana 2003, pet. denied).

For these reasons, we hold that the partial definition of waiver, if error, did not probably cause the rendition of an improper judgment, and the error, if any, was harmless.[64]

## VI. Escrowed Funds and Earnest Money

The Estate argues that it is entitled to the funds escrowed by Wal-Mart and RaceTrac's earnest money.

The Rule 11 agreement between the Estate and Wal-Mart provided that if RaceTrac obtained a judgment for specific performance and the gas restriction remained in place, Wal-Mart would be entitled to the $450,000.00 escrowed funds. Because we are affirming the trial court's judgment granting this relief, the Estate is not entitled to the escrowed funds pursuant to its agreement with Wal-Mart.

Similarly, the RaceTrac contract states that the Estate would receive RaceTrac's earnest money if the sale of the property was not consummated in accordance with the contract due to RaceTrac's default. The jury, however, found that Longfellow breached the contract, not RaceTrac, and we have concluded that the evidence is sufficient to support the jury's findings. Thus, the Estate is not entitled to RaceTrac's earnest money.

---

[64] *See* TEX. R. APP. P. 44.1(a); *Bed, Bath, & Beyond, Inc.*, 211 S.W.3d at 757.

## VII.  Conclusion

Accordingly, we overrule all of the Estate's issues and affirm the trial court's judgment.[65]

PER CURIAM

PANEL A:  CAYCE, C.J.; LIVINGSTON and GARDNER, JJ.

DELIVERED:  June 12, 2008

---

[65] Because we are affirming the trial court's judgment, it is unnecessary for us to reach the Estate's arguments that it is entitled to attorney's fees. *See* TEX. R. APP. P. 47.1.