

The Business Court of Texas,
Eleventh Division

| | | |
|---|---|---|
| DK TRADING & SUPPLY, LLC | § § | |
| *Plaintiff* | § | Cause No. 25-BC11B-0073 |
| v. | § § | |
| WINK TO WEBSTER PIPELINE LLC | § § | |
| *Defendant* | § § | |

## SYLLABUS[1]

In a suit on two contracts concerning a crude-oil terminal and pipeline, respectively, the court holds on cross-motions for summary judgment that the contracts are unambiguous and can be construed without resorting to extrinsic evidence. Analyzing the terminal contract's storage requirement in the context of the entire agreement, the court concludes the terminal must allocate two tanks exclusively for the plaintiff's use. The court holds the pipeline-transportation contract's "ship or pay" clause allows the plaintiff to include all crude oil— including shipments paid with credits earned from past billing periods—to reduce the deficiency payments owed when it fails to meet its crude-oil commitment. However, plaintiff's claim for miscalculated deficiency-payment billing as to the earliest disputed invoices is barred for failure to deliver timely written notice, which is a condition precedent to bringing suit that the court enforces according to the contract's plain terms.

---

[1] NOTE: The syllabus was created by court staff and is provided for the convenience of the reader. It is not part of the Court's opinion, does not constitute the Court's official description or statement, and should not be relied upon as legal authority.



FILED IN
BUSINESS COURT OF TEXAS
BEVERLY CRUMLEY, CLERK
ENTERED
5/27/2026

The Business Court of Texas,
Eleventh Division

| | | |
|---|---|---|
| DK TRADING & SUPPLY, LLC | § § § | |
| *Plaintiff* | § | Cause No. 25-BC11B-0073 |
| v. | § § | |
| WINK TO WEBSTER PIPELINE LLC | § § | |
| *Defendant* | § | |

## OPINION AND ORDER

¶1 Before the court are the Traditional Motion for Partial Summary Judgment filed by Plaintiff DK Trading & Supply, LLC ("Delek"), the response filed by Defendant Wink to Webster Pipeline LLC ("Wink"), and Delek's reply; and Wink's Traditional Motion for Partial Summary Judgment, Delek's response, and Wink's reply. Also before the court are Wink's Motion to Strike Delek's Traditional Motion for Partial Summary Judgment, Delek's response, and Wink's reply; and Delek's Motion to Strike Exhibits and Declaration of Keith Legrone, Wink's response, and Delek's reply. The parties presented their arguments at a hearing before the court on May 6, 2026. Having considered these filings, the parties' argument, and the relevant law, the court partially grants Delek's motions and partially grants Wink's motions for the reasons set forth below.

## Factual and Procedural Background

This case arises from the parties' 2021 agreements concerning crude-oil storage at, and pipeline transportation from, a multi-tank terminal facility in Midland County, Texas ("the Terminal"). The parties agree their motions center on these two contracts: (1) the Terminal Services Agreement ("Terminal Agreement"); and (2) the Amended and Restated Transportation Services Agreement ("Transportation Agreement").

Under the Terminal Agreement, Wink agreed to provide Delek[1] with specified "Storage Capacity" for the crude oil, to maintain connection to the pipeline, to accept crude oil meeting either the Pipeline Tariff's quality specifications or Delek's unique specifications, and to stage deliveries to the pipeline. In turn, Delek agreed to reimburse Wink for specified capital, operating, and maintenance costs for the Storage Capacity; to make a monthly terminal service payment; to provide minimum crude-oil inventory; and to make nominations as provided under the Transportation Agreement.

Under the Transportation Agreement, Wink agreed to receive Delek's nominated volumes of crude oil and deliver equivalent volumes at specified destination points. Delek agreed to ship its volume commitment each true-up period or pay a deficiency payment, to pay Wink's invoices on the stated timelines, and to

---

[1] Delek W2W, LLC was the original party to the Terminal Agreement; the parties do not dispute that its rights have since been assigned to Plaintiff DK Trading & Supply, LLC.

tender product that met certain quality specifications.

¶5        By its Motion, Delek asks the court to rule as a matter of law that: (1) the Terminal Agreement (a) grants Delek exclusive use of two Terminal tanks to store its designated crude oil and therefore (b) does not permit Wink to unilaterally store other crude oil in those tanks; and that (2) under the Transportation Agreement, (a) Delek's "Deficiency Payment" for each true-up period must be calculated based on crude oil Delek actually shipped, whether or not Delek paid for that shipment with Deficiency Credits; and (b) Wink's improper invoicing of those Payments constitutes an event of default.

¶6        Wink's cross-motion for summary judgment seeks a ruling as a matter of law against Delek's claims for: (1) declaratory judgment and breach of contract related to the Terminal Agreement; and (2) breach of the Transportation Agreement concerning six of the Deficiency Payment invoices for Delek's alleged failure to timely dispute those invoices.

## MOTION STANDARD

¶7        "A party that moves for traditional summary judgment must demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Energen Res. Corp. v. Wallace*, 642 S.W.3d 502, 509 (Tex. 2022); *see* TEX. R. CIV. P. 166a. The court takes as true all evidence favorable to the nonmovant, indulging every reasonable inference and resolving any doubts in the nonmovant's favor. *First Sabrepoint Cap. Mgmt., L.P. v. Farmland Partners Inc.*, 712

3

S.W.3d 75, 84 (Tex. 2025). In cases turning on contract interpretation, a movant seeking summary judgment bears the burden to conclusively establish the correct interpretation as a matter of law. *See Kachina Pipeline Co., Inc. v. Lillis,* 471 S.W.3d 445, 450–52 (Tex. 2015). When the contract is unambiguous, its construction is a question of law appropriate for summary judgment. *Cmty. Health Sys. Pro. Servs. Corp. v. Hansen,* 525 S.W.3d 671, 681 (Tex. 2017). If the movant meets its initial burden, the burden then shifts to the nonmovant to raise a genuine issue of material fact precluding summary judgment. *See Wal-Mart Stores, Inc. v. Xerox State & Loc. Sols., Inc.,* 663 S.W.3d 569, 584–85 (Tex. 2023).

## ANALYSIS

### A. The Terminal Agreement grants Delek exclusive use of two tanks.

¶8 The parties agree the Terminal Agreement is unambiguous and can be construed as a matter of law. "In doing so, [the court must] interpret contract language according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise." *Equinor Energy LP v. Lindale Pipeline, LLC,* 731 S.W.3d 324, 327 (Tex. 2026). Contract construction requires "considering the context in which words are used, avoiding constructions that render provisions meaningless, and construing contract provisions together so as to give effect to the whole." *Rosetta Res. Operating, LP v. Martin,* 645 S.W.3d 212, 219 (Tex. 2022) (citations omitted). Although courts' "primary goal in contract construction is to ascertain the true intentions of the parties, this 'intent' is a bit of a legal fiction."

4

*Equinor Energy,* 731 S.W.3d at 327 (internal citations and quotations omitted). Instead, Texas courts are "really looking for something objective, not subjective—hence our careful attention to the text of the contract itself." *Id.*

¶9 The parties also agree the Terminal Agreement requires that Wink "shall provide services to Delek by providing the Storage Capacity for exclusive use by Delek to ship crude oil." Terminal Agreement § 2.1. The parties diverge as to whether Wink can satisfy that promise by providing crude-oil storage in any combination of tanks commingled with other crude or whether Wink must provide two Delek-designated tanks. The Agreement contains several operative clauses answering the question:

- "Storage Capacity" is defined as "566,000 barrels, for the storage of Delek's crude oil . . . [to] be initially allocated among the Original Tanks," which are the Terminal's "Tanks 125169 and 125170." *Id.* §§ 1.28; 1.36. No party disputes that 566,000 barrels[2] is the volume capacity of two tanks.

- Wink shall make the Storage Capacity available to Delek "at all times during the Term." *Id.* § 2.1.

- Wink may store Delek's crude oil "in any tanks to which it has access" at the Terminal. These "Substituted Tanks" may be used instead of the Original Tanks as long as "such substitution maintains substantially similar receipt, delivery, and crude segregation capabilities, does not change or impact the available Storage Capacity, Terminal Service Payment, or materially impact the maintenance costs identified within the current Operating Budget, and Capital Budget." *Id.* §§ 1.36; 4.4.

- Delek must initially pay for a percent of Wink's capital expenditures to "construct" the Storage Capacity and necessary "ancillary facilities," and

---

[2] A "barrel" is 42 gallons of crude oil at a specified temperature and pressure. Terminal Agreement § 1.2.

must then reimburse Wink for costs to maintain and operate the Storage Capacity "and any associated equipment." *Id.* § 4.1–4.2. If any costs cannot be "segregated from other costs incurred," they must be prorated to determine Delek's share. *Id.* § 4.2.

- The parties' agreement forecasts the maintenance and operating costs for the "Delek Tanks Only," for which Delek would bear its equitable allocation of total costs incurred. *Id.* at Ex. A.

- Upon the Agreement's termination, Delek must "remove all crude oil, including tank bottoms, from the tanks used to provide the Storage Capacity, and [] reimburse [Wink] for any necessary cleaning cost to return the Storage Capacity to service." *See id.* § 3.2.

- Delek could choose to store its own Delek-grade crude oil or crude oil satisfying the Pipeline Tariff. *See id.* §§ 1.14, 2.1, and 5.1.

¶10    Giving these terms their ordinary meaning and reading the Agreement in its entirety, Wink agreed to provide crude-oil storage in two tanks to be exclusively used by Delek. First, the Agreement repeatedly and consistently treats Storage Capacity as comprising tangible facilities rather than an intangible amount of space—such as by contemplating Delek's shared costs for the Storage Capacity's construction, maintenance, and cleaning. And there would be no need to reference "segregated" maintenance costs for the Storage Capacity if the term meant nothing more than a volumetric promise of fungible storage space somewhere in the Terminal. Further, the Agreement grants Delek the right to store its own unique-grade product, which undisputedly could not be mixed with tariff-grade crude oil. Though Wink claims Delek has never exercised its right to store Delek-grade crude, the Agreement noticeably **omits** any language creating differing storage obligations based on which product Delek chooses to store. Both grades of crude must be stored "in the Storage

6

Capacity," which must be available to Delek "at all times." *Id.* §§ 2.1; 5.1. This "Storage Capacity" must be provided in the form the parties originally negotiated in the Agreement, regardless of whether Delek is exercising its right to store Delek-grade oil and even if Wink now questions Delek's need for its own tanks. *See Sundown Energy LP v. HJSA No. 3, Ltd. P'ship*, 622 S.W.3d 884, 889 (Tex. 2021) (per curiam) ("[C]ourts are obliged to enforce the parties' bargain according to its terms").

¶11     Not only was Delek granted two specific tanks from the beginning, but Wink could use different tanks only by "substitution," which is the "designation of a person or thing to take the place of another person or thing." BLACK'S LAW DICTIONARY (12th ed. 2024). And "[i]f tanks are substituted, [Wink] shall provide Delek with a revised" minimum number of barrels of product that Delek must provide to operate those tanks. Terminal Agreement §§ 1.25; 2.2. In other words, Wink can substitute one tank for an initial tank—it may do so multiple times over provided the substitution does not alter Delek's pricing and certain other terms. But specifying conditions for tank "substitution" would be unnecessary if the contract had always allowed Wink to simply disseminate Delek's crude oil across as many tanks as Wink wished. The Agreement also guarantees that Delek's use of the Storage Capacity shall be "exclusive," which has little meaning if the agreement were merely for a specified volume of storage in any combination of shared tanks. *See Sundown Energy*, 622 S.W.3d at 889 (avoiding construction that would render

7

provisions meaningless).

¶12     These clauses reveal the parties' objective intent to allocate two tanks to Delek. But courts must also "avoid constructions of contract language that would lead to absurd results." *Id.* Wink's proposed construction leads to an absurd result: upon the Agreement's termination, Delek's obligation to empty and clean every tank containing even a gallon of Delek's crude. Faced with this absurdity, Wink proposes that the clean-out clause applies only "**in the event** [Delek is] solo in that tank or [] the last man standing in that tank." But the court "cannot rewrite the parties' contract or add to or subtract from its language." *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 770 (Tex. 2018). Section 3.2's clean-out requirement applies to all "tanks used to provide the Storage Capacity," without the conditional language Wink adds. If the parties' bargained-for agreement of Delek-designated tanks were stripped away, the contract would force Delek to drain third parties' crude oil from Wink's tanks. It is only by adding to the contract that Wink can reach a reasonable reading comporting with its position.

¶13     The Terminal Agreement grants Delek exclusive use of two tanks. While those tanks may be substituted for other tanks, Wink gave Delek more than a volumetric promise of Terminal storage. As to this issue, Delek's motion for summary judgment is granted.

**B. The court construes the Transportation Agreement's Deficiency Payments clause in Delek's favor as a matter of law.**

## 1. The Transportation Agreement requires all "actually shipped" crude oil to reduce Delek's Deficiency Payments.

¶14 As to the Transportation Agreement, the parties disagree on the method for calculating Deficiency Payments and applying Deficiency Credits. Under the Agreement, Delek committed to ship a specified volume of crude oil each "True-Up Period," which covered a certain (and confidential) number of months. Transportation Agreement § 1.07 (defining *Barrels per day*); § 1.58 (defining True-Up Period's total Volume Commitment based on number of days in the Period); § 1.65 (defining *True-Up Period*); § 1.67 (defining daily Volume Commitment in Barrels per day).

¶15 First, the Deficiency Payments: If Delek fails to ship its total Volume Commitment by the end of the True-Up Period, Delek "shall make a payment to [Wink] equal to"—

- Delek's Deficient Barrels, which is defined as: "for a particular True-Up Period, the positive difference, if any, between the [] Volume Commitment for such True-Up Period and the Actual Shipments";
- multiplied by a confidential multiplier.

*Id.* § 1.21; 7.03. In simplest form, omitting the *force majeure* prongs that neither party invokes, the calculation is:

**Deficiency Payment = (Volume Commitment – Actual Shipments) x Rate Multiplier.**

¶16 Second, the Deficiency Credits: After Delek pays Wink a Deficiency Payment, Delek may, over the following "Deficiency Use Period," apply that Payment as a

credit "on a dollar-for-dollar basis against any charges" owed to Wink for Actual Shipments in any month that exceed Delek's Monthly Volume Commitment. *Id.* §§ 1.42; 7.03. Delek can apply Credits to exceed its commitment only if capacity remains after all nominations for shipments not paid with Credits are satisfied. *Id.*

¶17    The parties' dispute hinges on the interplay between Deficiency Payments and Credits. To reduce its Deficiency Payments, Delek contends it may satisfy its multi-month Volume Commitment with all shipments, even those paid for with Deficiency Credits it previously accrued. Wink disagrees, pointing out that the Credits would then operate to reduce both Delek's monthly shipment costs and its subsequent Deficiency Payments. Delek is correct.

¶18    The "principle of freedom of contract requires us to recognize that sophisticated parties have broad latitude in defining the terms of their business relationship, and courts are obliged to enforce the parties' bargain according to its terms." *Equinor Energy*, 731 S.W.3d at 330. The Agreement's express terms unambiguously deduct **all** Actual Shipments from Delek's True Up Volume Commitment, regardless of how Delek paid for those shipments. Actual Shipments could not be more plainly defined: "the number of Barrels of Product that [Delek] actually shipped on the Pipeline during a True-Up Period." Transportation Agreement § 1.01. Nothing in the Agreement requires Delek to pay a higher Deficiency Payment in a subsequent True-Up Period based on its choice to use its Credits against the cost for the higher volume it shipped in a previous month.

¶19 Further, Wink's proposed construction cannot practically apply due to the time periods used for each calculation. Deficiency Payments are calculated only at the conclusion of a multi-month Period. Transportation Agreement §§ 7.03; 8.02 (describing Deficiency Payment calculations based on multi-month volume commitment and billed at "the end of each True-Up Period"). Deficiency Credits, on the other hand, are used to reduce excess-shipping charges that are calculated and invoiced on a single-month basis. *Id.* §§ 7.03; 8.01 (describing monthly billing for transportation charges and Deficiency Credits used for shipments in excess of the Monthly Volume Commitment). Credits that are applied monthly would not mathematically alter these multi-month totals, or "True Ups," that are inputted into the Deficiency Payment calculation. Separating out a single month's shipment amount to reduce it through Credits, as Wink requests, would violate the Agreement's mandate to calculate each Deficiency Payment based solely on the netting of each multi-month total. *See id.* § 7.03.

¶20 Wink argues that Delek's construction threatens the parties' "ship or pay" bargain by ultimately reducing Delek's payments in subsequent True-Up Periods. In Wink's illustrative calculations, Delek ends up paying **less** than the full cost of its Volume Commitment during a Period in which a month's overshipments were paid with Deficiency Credits:

| True Up Period | Volume Commitment | Actual Shipped | Delek Payment to W2W |
|---|---|---|---|
| Period A | 1 Million Barrels | 800K Barrels | Delek pays for for 1 million Barrels (800K Actual + 200K Deficient) |
| Period B | 1 Million Barrels | 800K Barrels *but assume Delek over-ships by 100K in one month of the True Up Period* | Delek pays for 900K Barrels (700K Actual +200K Deficiency Payments) *The remaining 100K is covered with prior earned Deficiency Payments* |
| *Total* | *2 Million Barrels* | *1.6 Million Barrels* | *Payment for 1.9 Million Barrels* |

True, but Delek also pays **more** than the volume it actually shipped.[3] This compromise was the bargain the parties struck and drafted into their contract; the court will not retrade their bargain for them. *See Am. Midstream, LLC v. Rainbow Energy Mktg. Corp.*, 714 S.W.3d 572, 574 (Tex. 2025) ("We have long held that courts will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained."). Regardless, Delek still must "ship or pay." Any Credits Delek uses were not free; Delek paid for them in a previous True-Up Period.

¶21    Wink also argues the clause is ambiguous, but its position relies on extrinsic evidence, which cannot be used to create an ambiguity. *Apache Corp. v. Apollo Expl., LLC*, 670 S.W.3d 319, 334 (Tex. 2023). As explained below, the court sustains Delek's objections to evidence that Wink submits to aid or alter construction of the

---

[3] In other examples, Delek ends up paying less than the volume actually shipped, which occurs in True-Up Periods that Delek's monthly deficits total less than double its monthly surpluses, assuming all surpluses were paid with Credits. And no one disputes that if Delek's monthly deficits net out as **less** than its surpluses during a True-Up Period, Delek will pay for less than it actually ships when relying on Credits—in that event, there is no Deficiency Payment at all, so the Credits lower Delek's shipment costs as intended.

Transportation Agreement. Standing on its own, the clause is perfectly understandable and not contradictory. There is only one reasonable meaning to Section 7.03 and the calculation it requires.

### 2. Wink's affirmative defenses do not preclude summary judgment on the Deficiency Payment dispute.

¶22 Finally, Wink claims its affirmative defenses of waiver, ratification, estoppel, and modification prevent summary judgment as to Section 7.03. Delek notes the parties bound themselves to an anti-waiver clause stating that "[n]o waiver of any provision set forth under this Agreement shall be binding upon a Party unless its waiver is expressly set forth in a written instrument which is executed and delivered on behalf of such Party by an authorized representative of such Party." Transportation Agreement § 18.04. Regardless, to defeat Delek's motion, Wink "must present summary-judgment evidence raising a fact issue on each element of [its] affirmative defense. . . . ." *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 593 (Tex. 2017). Wink's briefing does not identify the elements of any of these defenses or point to evidence raising a fact issue on those elements. Though Wink states it expects to learn additional facts during discovery as to Delek's "intentional adoption" of Wink's contract construction, Wink's expectation neither meets its evidentiary burden nor satisfies the requirements of Texas Rule of Civil Procedure 166a(d)(3).

¶23 Wink has not raised a fact issue on an affirmative defense to defeat Delek's

13

motion for summary judgment regarding the Deficiency Payment calculation. As to construction of the Transportation Agreement's Section 7.03, the court grants summary judgment for Delek.

**C. The court denies Delek's motion for summary judgment as to the Event of Default clause.**

¶24 Delek also seeks summary judgment as to the Transportation Agreement's "Event of Default" clause. "Event of Default" is defined by a list of six alternative events, including "failure of the Defaulting Party to comply with any of its obligations under" the Agreement, contingent on specific notice-and-cure requirements. Transportation Agreement § 12.01(c). A default allows the other party an election of remedies, including termination. *Id.* §§ 12.02, 12.05.

¶25 At this stage, Delek does not attempt to prove Wink committed an event of default, but it instead asks for a matter-of-law holding that an improper Deficiency Payment invoicing would satisfy the definition—provided Delek in fact gave the requisite notice and Wink failed to properly cure or commence to cure during the allotted time period. On this record, the court declines to hold that a certain type of theoretical breach by Wink—assuming Delek's theoretical notice of that breach and Wink's theoretical failure to cure according to the Agreement's specific terms—is a contractual Event of Default. Without weighing on the merits of Delek's construction of Section 12.01, the court denies Delek's motion for summary judgment on this issue.

14

## D. The Transportation Agreement conditions Deficiency Payment litigation on timely notice of the dispute.

¶26 Wink moves for summary judgment as to the Transportation Agreement's notice clause for "Deficiency Payment Billing," arguing that notice is a condition to bringing suit. The Agreement's notice clause states:

> Section 8.02 Deficiency Payment Billing. Following the end of each True-Up Period, Carrier shall submit an invoice to Shipper for any Deficiency Payment that Shipper owes to Carrier for such True-Up Period. Shipper agrees to pay such invoice within ten (10) Business Days of receipt thereof but in no event shall payment be due before the twentieth (20th) day of the Month in which Shipper receives Carrier's invoice. If Shipper has a good faith dispute over the calculation made in such invoice, Shipper shall provide written notice of such dispute to Carrier no later than the due date of Carrier's invoice and shall pay the undisputed portion by the due date. Within ten (10) Business Days of the date of Carrier receiving Shipper's written notice, the Parties will try to resolve the disputed portion of the invoice. If the Parties are unable to reach an agreement within such term, either Party may proceed with any right or remedy available to it under this Agreement, at law or equity.

Wink is correct that Delek cannot pursue its rights as to the oldest six disputed invoices due to failure to timely dispute them.

### 1. Section 8.02 creates a condition precedent.

¶27 "A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation." *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 108 (Tex. 2010). "A covenant, as distinguished from a condition precedent, is an agreement to act or refrain from acting in a certain way." *Id.* "Breach of a covenant may give rise to a cause of action for damages, but does not affect the enforceability of the remaining provisions of the contract unless the breach is a material or total breach." *Id.* "Conversely, if an express condition is not satisfied, then the party whose performance is conditioned is excused from any obligation to perform." *Id.*

15

¶28    The court decides whether a contractual provision is a condition precedent, or merely a covenant, by examining the contractual terms to ascertain the parties' intent. *See Criswell v. Eur. Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990). "In order to make performance specifically conditional, a term such as 'if', 'provided that', 'on condition that', or some similar phrase of conditional language must normally be included." *Id.* Texas law enforces contractual terms that require written notice as a condition to enforcing an obligation of the other party. *See, e.g., James Constr. Grp., LLC v. Westlake Chem. Corp.*, 650 S.W.3d 392, 404–09 (Tex. 2022). Absent substantial compliance by giving notice in writing, the party loses its right to enforce that obligation. *Id.* at 415. When a contract conditions a party's claims on timely notice of the dispute, the lack of notice acts as a condition precedent that bars those claims in litigation. *Cajun Constructors, Inc. v. Velasco Drainage Dist.*, 380 S.W.3d 819, 826 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (affirming summary judgment where party failed to give notice of dispute).

¶29    Here, the Transportation Agreement creates a multi-step process for dispute resolution concerning a Deficiency Payment invoice. First, Delek must provide written notice by the invoice due date, after which the parties have ten business days to attempt to resolve their dispute. Then, a party may pursue "any right or remedy . . . at law or equity" **if** the parties fail to reach agreement on "the disputed portion of the invoice" within the ten-day period following Delek's written notice. This section, read in its entirety, establishes a specific condition for pursuing one's rights

16

or remedies as to one narrow topic: a "dispute over the calculation made in [an] invoice" for Deficiency Payment billing. For one discrete type of billing dispute, the very type at issue here, the Agreement hinges Delek's rights on a dispute-resolution procedure that must be triggered by written notice.

¶30    The court cannot remove the conditional "if" from section 8.02. And viewing the "if" with tunnel vision as Delek asks—applying the condition only to the final sentence and not to the full dispute-resolution process triggered by Delek's notice—would nullify its purpose. To "proceed with any right or remedy" under the contract and law, Delek was first required to timely notice and attempt to resolve this type of dispute. *See Arbor Windsor Court, Ltd. v. Weekley Homes, LP*, 463 S.W.3d 131, 136 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (holding notice clause was condition precedent to any remedy where clause provided notice "during which time same may be cured prior to exercise of any rights or remedies pursuant to this Agreement."). The parties' objective intent, reflected in the contract's terms, was to condition any remedy for disputed Deficiency Payment calculations on timely written notice.

### 2. Delek's prior-material-breach theory does not excuse its performance of Section 8.02.

¶31    Delek argues Wink's erroneous invoicing was a prior material breach that excused Delek from the notice requirements. A prior breach excuses future performance only when it is "material," based on a number of factors:

- o the extent to which the injured party will be deprived of the benefit which he reasonably expected;
- o the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
- o the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
- o the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances;
- o the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436-37 (Tex. 2017).

¶32     Delek has not placed evidence supporting these factors into the record. Instead, Delek relies on nonbinding precedent that failed to address materiality altogether. *FPL Energy Upton Wind I, L.P. v. Austin*, 240 S.W.3d 456, 463 (Tex. App.—Amarillo 2007, no pet.). On this record, the contract itself guides the materiality analysis. *See Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 199 (Tex. 2004). Here, the parties' Agreement shows they reasonably expected improperly calculated invoices to be handled through a notice-and-cure process—not that an improper calculation would **itself** discharge the parties from that process. Section 8.02's meaning would be a vitiated if an improperly calculated invoice were deemed to excuse engagement in those steps. *See In re ACE Am. Ins. Co.*, 69 Tex. Sup. Ct. J. 659, 2026 WL 1261448, at *5 (May 8, 2026) (holding prior material breach did not excuse engagement in dispute-resolution appraisal because,

if "insured could avoid appraisal by alleging a dispute over coverage or claims handling, appraisal clauses would be virtually a nullity.") (internal quotations omitted).

### 3. Section 8.02 does not alter the limitations period.

¶33 Delek contends the Transportation Agreement's notice clause is void because it alters the statute of limitations.

¶34 "[A] person may not enter a stipulation, contract, or agreement that purports to limit the time in which to bring suit on the stipulation, contract, or agreement to a period shorter than two years." TEX. CIV. PRAC. & REM. CODE § 16.070. Such agreements are void. *Id.*

¶35 Here, the Agreement requires timely notice of any "good faith dispute over the calculation made in [a Deficiency Payment] invoice." Transportation Agreement § 8.02. The clause places no limit on the "time in which to bring suit" as would be prohibited by Section 16.070. Instead, it limits the time to give "written notice of such dispute to Carrier," Wink. Providing written notice to a carrier is not, and does not have the effect of, "bring[ing] suit." *See* TEX. CIV. PRAC. & REM. CODE § 16.070; *e.g., Town & Cnty. P'ship v. Dyad Constr., L.P.*, No. 14-22-00339-CV, 2023 WL 3529696, at *8 (Tex. App.—Houston [14th Dist.] May 18, 2023, no pet.) (holding Section 16.070 did not apply because "one-year limitation serves only to specify when the warranty claim must be presented ... — not when a lawsuit must be filed").

¶36 The subsequent section of Chapter 16 constrains contractually imposed

19

notice rather than contractually imposed limitations. *See* TEX. CIV. PRAC. & REM. CODE § 16.071 ("A contract stipulation that requires a claimant to give notice of a claim for damages as a condition precedent to the right to sue on the contract is not valid unless the stipulation is reasonable."). Delek has opted not to rely upon Section 16.071, probably because the Texas Supreme Court's strict construction of the "notice of a claim for damages" language would exclude the parties' notice clause at issue here. *See Am. Airlines Employees Fed. Credit Union v. Martin*, 29 S.W.3d 86, 97–98 (Tex. 2000); *see also El Paso Cnty. v. Sunlight Enter. Co., Inc.*, 504 S.W.3d 922, 927 (Tex. App.—El Paso 2016, no pet.) (holding Section 16.071 must be strictly construed because it is "restrictive and in derogation of the common-law right to freely contract."); *Komatsu v. U.S. Fire Ins. Co.*, 806 S.W.2d 603, 606 (Tex. App.—Fort Worth 1991, writ ref'd) (same).[4]

¶37    The statute also creates an exception for a contract "relating to the sale or purchase of a business entity if a party . . . pays or receives or is obligated to pay or receive consideration under the contract having an aggregate value of not less than

---

[4] In *Martin*, "the notice requirement . . . [was] similar to a condition precedent—[the claimant's] ability to recover for unauthorized transactions is conditioned upon his discovering and reporting those transactions within the specified time period." 29 S.W.3d at 95. The Court concluded that "section 16.071 by its terms does not apply here, when the notice to be given is not notice of a claim for damages, but rather notice of unauthorized transactions." *Id.* (internal footnotes omitted); *see also Ridglea Est. Condo. Ass'n v. Lexington Ins. Co.*, 415 F.3d 474, 479 (5th Cir. 2005) (holding under Section 16.071 that notice of a loss was not a "notice of a claim for damages" but was instead a "notice of the happening of an event upon which liability may or may not result."); *El Paso Cnty.*, 504 S.W.3d at 928 (holding "notice of a claim for additional compensation . . . is only a precursor to a possible cause of action for damages, which 'may or may not result.'").

"$500,000." Tex. Civ. Prac. & Rem. Code §§ 16.070(b); 16.071(f). The court does not reach the question of whether that exception applies here.

### 4. Section 8.02 bars Delek's claims for relief as to the six oldest disputed invoices.

Delek presents no evidence refuting that its first notice of any Deficiency Payment dispute was served months after the timely-notice period ran for the six oldest disputed invoices. Delek's letter, submitted for the sake of optional completeness, instead confirms what Wink's evidence proves; that Delek first discovered and notified Wink of its dispute concerning the 2022, 2023, and 2024 calculations in August 2025.[5] Delek has not otherwise attempted to raise a genuine issue of material fact excusing its lack of timely notice.

A potential "dispute over the calculation made in such [Deficiency Payment] invoice" was anticipated by the parties, who outlined the necessary steps for resolution of this exact dispute. The court will enforce the notice provision as written. Having concluded that Delek raises no fact issue regarding its failure of the Agreement's condition precedent for pursuing its claims for the 2022, 2023, and 2024 invoices, the court grants summary judgment for Wink on its breach-of-contract claim as to that issue.

### E. The court partially grants each party's motion to strike.

---

[5] Having ruled in Wink's favor as to Section 8.02's notice clause, the court need not reach Wink's argument that the Agreement's Section 8.04, deeming three of the invoices "final" after 24 months, precludes Delek's recovery as to those invoices.

¶40 "The same evidentiary standards that apply in trials also control the admissibility of evidence in summary-judgment proceedings." *Seim v. Allstate Texas Lloyds*, 551 S.W.3d 161, 163 (Tex. 2018); *see also* TEX. R. CIV. P. 166a(j) (declaration supporting summary judgment must "be made on personal knowledge, set out facts that would be admissible," and show declarant "is competent to testify to the matters stated"). Accordingly, a party may move to strike summary-judgment evidence that fails those standards. *See, e.g., Kerlin v. Arias*, 274 S.W.3d 666, 667–68 (Tex. 2008).

### 1. Wink's objections to Delek's unauthenticated material in Delek's briefing are sustained.

¶41 Wink asks the court to strike the entirety of Delek's motion because it relies on unauthenticated figures and demonstratives that appear in the body of the motion but are not separately attached or proven up as evidence. The court grants Wink's motion in part by striking those figures. Wink identifies no authority that would demand (or allow) striking Delek's motion in its entirety.

### 2. Delek's parol-evidence objections are sustained in part.

¶42 Delek, in turn, moves to strike a supporting declaration submitted by Wink's service provider Keith Legrone and attached exhibits, objecting to their consideration as improper extrinsic evidence and on other grounds.

¶43 "If contract language can be given a certain or definite legal meaning when considered as a whole, and in light of the objective circumstances surrounding its

22

execution, the contract is not ambiguous and must be construed as a matter of law." *Finley Res., Inc. v. Headington Royalty, Inc.*, 672 S.W.3d 332, 340 (Tex. 2023) ("[A] contract is ambiguous only if it is subject to more than one reasonable interpretation after the pertinent rules of construction have been applied").

¶44 The Agreements can be given the certain and definite legal meanings described above. Because the contracts' text is unambiguous, it must be "enforced as written without considering extrinsic evidence bearing on the parties' subjective intent." *Devon Energy Prod. Co., L.P. v. Sheppard*, 668 S.W.3d 332, 343 (Tex. 2023). Wink submits Legrone's subjective statements concerning his own interpretation of the contract, which are inadmissible. *See URI, Inc.*, 543 S.W.3d at 768 ("Because objective intent controls the inquiry, only circumstantial evidence that is objective in nature may be consulted."). The court therefore grants Delek's motion to strike these statements and the course-of-performance evidence that Wink submits to construe this unambiguous contract. *See id.*; *Equinor*, 731 S.W.3d at 329-30 ("[C]ourts can't consider course-of-performance evidence to interpret an unambiguous contract."), *quoted in May v. Ineos USA Oil & Gas LLC*, 2026 Tex. Bus. 20, ¶¶ 5-6, 2026 WL 1195929, at *1-2 (4th Div.).

¶45 It is true that, "when contractual text alone is inconclusive, courts may consider the facts and circumstances surrounding the contract, including the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give context to the parties' transaction."

23

*Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020) (internal brackets and quotations omitted). But the limited industry information provided in paragraphs 19 and 20 of Legrone's declaration is largely subjective opinion, is unneeded to construe the Transportation Agreement's Deficiency Payment clauses, which are conclusive on their face, and in any event could not alter the court's construction of those clauses. Delek's motion to strike is granted as to paragraphs 7–14, 18–27, and 33 of Legrone's declaration. The court need not reach Delek's remaining evidentiary objections to these portions of the declaration.

### 3. Delek's objections concerning the remaining portions of Legrone's declarations are overruled.

¶46    Legrone's declaration also offers evidence to show the timing of the 2022–24 invoices sent to Delek and of its notice of dispute. Such evidence is not improper parol evidence because Wink presents it to prove Delek's written notice was untimely as to those invoices and not to aid the court's construction of the Agreement. Delek generally objects that Legrone has not shown personal knowledge as to the facts in his declaration, but Legrone shows a factual basis for his personal knowledge of these invoices by identifying his role in Wink's pipeline operations and describing his familiarity with the Transportation Agreement and with the parties' dealings, including invoicing and calculation of Deficiency Payments.

¶47    Texas Rule of Evidence 408 does not prevent this evidence's inclusion, either, because it is being offered to prove Delek's failure to satisfy the contract's notice

24

provision rather than to prove or disprove a claim's validity. TEX. R. EVID. 408(b) (permitting admission of evidence "for another purpose," including negating a contention of undue delay), *cited in DrinkPAK, LLC v. PRIII/Crow Bldg. C, LP*, 2026 Tex. Bus. 27, ¶¶ 18-21, 2026 WL 1347499, at *4-5 (8th Div.).

¶48 Delek does not describe with specificity any other grounds for excluding this evidence, so the court denies Delek's motion to strike paragraphs 1-6, 15-17, and 28-32 of Legrone's declaration, along with the corresponding exhibits.

### CONCLUSION AND ORDER

Having considered the parties' motions for partial summary judgment, motions to strike, the applicable law, and all arguments of counsel, the Court partially grants each motion as follows and concludes the parties' Agreements are unambiguous with respect to the issues adjudicated in this Order, holding as a matter of law that:

(1) the Terminal Service Agreement, effective September 30, 2021, grants Plaintiff Delek exclusive use of two tanks at Plains Marketing, L.P.'s crude oil terminal in Midland, Texas for the storage of up to 566,000 barrels of crude oil;

(2) the Terminal Services Agreement does not permit Wink to unilaterally place crude oil meeting the quality specifications set forth in the Pipeline Tariff in tanks designated for Delek;

(3) under the Amended and Restated Transportation Services Agreement, effective September 30, 2021, Wink must calculate the Deficiency Payment for each "True-Up Period" such that the number of Deficient Barrels under Section 7.03(a)(i) is computed in a manner that accounts for every Barrel of Product actually shipped on the Pipeline during the True-Up Period from one or a combination of Origin Point(s) to one or a combination of Destination Point(s); and

(4) Delek's claims for breach of contract, as those claims relate to Invoice Nos. 2022-07, 2023-01, 2023-07, 2024-01, 2024-07, and 2025-01 (Exhibits F-1 through F-6 to Wink's Partial Motion for Traditional Summary Judgment), are DISMISSED WITH PREJUDICE.

In any remaining respect other than as expressly granted in this Order, the parties' motions for summary judgment are DENIED.

Delek's motion to strike is GRANTED IN PART as described above. Delek's objections on the basis of parol evidence in paragraphs 7–14, 18–27, and 33 of Keith Legrone's declaration in support of Wink's Traditional Motion for Partial Summary Judgment and Wink's Response to Delek's Motion for Traditional Motion for Partial Summary Judgment are SUSTAINED. Delek's objections to paragraphs 1–6, 15–17, and 28–32 of Legrone's declaration, along with the corresponding Exhibits B, C, F, G, and H are OVERRULED.

Wink's motion to strike is GRANTED IN PART as described above. Wink's objections to Figures 1–4 and the demonstratives on pages 5, 6, 9, 11, and 21–23 of Delek's Motion for Traditional Motion for Partial Summary Judgment are SUSTAINED. In all other respects, Wink's motion to strike is DENIED.

SO ORDERED.

STACY ROGERS SHARP
Judge of the Texas Business Court,
Fourth Division, *sitting by assignment in the Eleventh Division*

SIGNED ON: May 27, 2026

26